## LIE, MASTER OF THE NORWEGIAN STEAMSHIP "SELJA," &c. *v.* SAN FRANCISCO & PORTLAND STEAMSHIP COMPANY, CLAIMANT OF THE AMERICAN STEAMSHIP "BEAVER," &c.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 110. Argued December 21, 1916.—Decided March 6, 1917.

When a steam vessel proceeding in a fog hears apparently forward of her beam the fog signal of another vessel whose position is not ascertained, the duty to stop the engines, if the circumstances admit, is imperative, under Article 16 of the International Regulations for preventing collisions at sea, adopted by the Act of August 19, 1890, 26 Stat. 320, and effective July 1, 1897, 29 Stat. 885.

A negligent breach of this statutory duty, contributing directly to cause a collision, is not excusable upon the ground that the vessel was navigated in accordance with what would have been good seamanship had not the duty been imposed.

When a collision is attributable to the palpable negligence of both masters, the negligence of each continuing to operate as an efficient cause until the moment when the accident occurs, the doctrine of major and minor fault does not apply.

219 Fed. Rep. 134, affirmed.

THE case is stated in the opinion.

*Mr. Edmund B. McClanahan,* with whom *Mr. S. Hasket Derby* and *Mr. L. Russell Alden* were on the briefs, for petitioner.

*Mr. J. Parker Kirlin* for respondent.

MR. JUSTICE CLARKE delivered the opinion of the court.

On his own behalf and on behalf of the owners, officers and crew of the Norwegian steamship "Selja," the peti-

tioner, Olaf Lie, her master, instituted this suit in admiralty against the American steamship "Beaver" to recover for the loss of the "Selja," her equipment and the personal effects of her officers and crew, which was occasioned by the collision of the two ships on the afternoon of November 22, 1910, near Point Reyes, on the California coast. For the purposes of trial this case was consolidated with an intervening libel by the owners of the cargo of the "Selja" and with an independent suit by her charterers to recover for loss of freight.

When approaching San Francisco, the end of her voyage from Yokohama, the "Selja," a freight carrying steamship, collided in a fog with the "Beaver," a passenger and freight carrying steamer then on a voyage from San Francisco to Portland, Oregon, and was so damaged that she sunk, a total loss, in about fifteen minutes.

From one o'clock in the morning of November 22nd, the "Selja" had been running in a fog which, for a considerable time before the collision, was so thick that it was possible to see only about twice her length—about 800 feet.

The master of each ship makes the characteristic claim that at the moment of collision he had his engines working full speed astern, and each claims that his vessel was without headway when the two came together. It is beyond controversy, however, that the "Beaver" was running at a rate of speed much too high for prudent navigation in the then prevailing fog until her master heard the whistle of the "Selja" about three minutes before the accident, and it is beyond controversy also that this negligent speed contributed directly to cause the collision. The two lower courts agree that the "Beaver" was culpably negligent but they also find that the master of the "Selja" was likewise negligent in the navigation of his ship in a manner which contributed directly to bring about the accident, and therefore, while allowing

recovery by the owners and underwriters of the cargo, by the charterers of the "Selja" and by her other officers and crew, they decreed that, apportioning the damages suffered by the owner and master of the "Selja" and by the owner of the "Beaver," under the usual rule of cross liabilities, there could be no recovery by the master, Lie, personally, or by the owners of the "Selja," and it is from this denial of the right to recover by Lie and by the owners of the "Selja" and from the order as to the payment of costs that this appeal is prosecuted.

The petitioner claimed in the courts below and in this court still claims, that if the master of the "Selja" was negligent at all, which is denied, his negligence was of such a character and had so spent its effect long before the accident, that in the most unfavorable view that can be taken of it was a remote and not a proximate cause of the collision and that, therefore, the "Beaver" being palpably negligent, he has a lawful right to recover.

The master of the "Selja" admits that he heard, what ultimately proved to be the warning fog whistle of the "Beaver," at three o'clock, and therefore the ships must be considered as within the danger zone from that time forward, and the decision of the case turns upon what was done by the two vessels during the sixteen minutes which elapsed between three o'clock and the moment of collision.

There is all of the customary conflict between the stories told by the officers of the respective vessels, but we think that a correct and just decision of the case may be arrived at by accepting the statements of the master of the "Selja," as they appear in various parts of the record.

His narrative of what occurred during the fateful sixteen minutes after three o'clock may be condensed into the following:

At three o'clock I was running at half speed (six knots an hour) and very shortly after that I heard for the first

time "a whistle about right ahead"—"dead ahead"—which proved to be the whistle of the "Beaver." "It sounded faint, but distinct," and I could then see only about two lengths of my ship (about 800 feet). The sea was calm, with a long westerly swell, there were no noises on the ship to interfere with my hearing the whistle, which blew at intervals of 56 or 57 seconds and for five seconds each time. When I first heard the whistle it sounded far away, and "it just came into my mind that it might be one of the fog horns off the Golden Gate," at Point Bonita, about twenty miles away. After I heard the whistle the third time I commenced to time it and continued to do so until five minutes past three o'clock, when I concluded that it was the whistle of an approaching steamer, and I reduced speed from half speed (six knots) to slow speed (three knots an hour) because "I considered that six knots was not moderate enough under the circumstances." I did not stop my engines when I first heard the whistle or when I concluded that it was that of an approaching steamer "because the sound was located as good as it could be located in the fog and showed absolutely no danger of a collision." (This statement is twice repeated in the testimony.) "I was familiar with the international rule which requires a steamer to stop in a fog." During the entire fifteen minutes before the accident I heard the whistle of the "Beaver" blow every 56 or 57 seconds and for five seconds at a time, and the "Selja" blew one single blast between each two blasts of the "Beaver's" whistle—I "answered his whistle" from three o'clock until the collision. My engines were reduced to slow speed at five minutes after three o'clock, and they were kept at this speed—three knots an hour—until 3.10 o'clock when they were stopped. At 3.13 my ship still had steerage way upon her and at 3.14 she was not quite at a standstill, but was still moving a little through the water and I intended to answer the "Beaver's" next whistle with

two blasts of my whistle, which would have meant that my boat was stopped and had no way upon her. I did not tell my third officer to blow the two whistles as I intended to do "because the 'Beaver' loomed in sight and I saw her blow three whistles." I mean "I saw steam come out of his whistle and I heard it, of course, at the same time." "She loomed in sight and the three whistles were almost at the same time." When I saw and heard the three whistles from the "Beaver" I told my third officer to blow three whistles, and I rang "full speed astern" on my engine at the same time. I noticed that the "Beaver" was coming fast by the way she cut the water. I was watching the "Beaver" carefully and I thought probably she would pass wide of me, her starboard side was widening all the time and I was watching her. I first saw the "Beaver" approaching at about 3.15. She was then about 900 feet away and about a minute after, the collision came.

The foregoing statements of fact are as favorable to the petitioner as he can possibly deserve. They leave out of account a number of statements claimed to have been made by him; to the master of the "Beaver" immediately after the accident; to the agent of the company which had the "Selja" under charter on the day after the accident, and to the United States inspector of steam vessels on the second day after the accident, all of which are in serious conflict with, and are much less favorable to, his claim than the summary we have given.

In the year 1889 representatives of over thirty of the maritime nations of the world met in convention at Washington for the purpose of discussing the international code of rules to prevent collisions at sea, and of suggesting such changes and modifications as experience had shown to be necessary. The recommendations of this convention were adopted by Act of Congress of August 19, 1890 (26 Stat. 320), became effective by proclamation of the

President (29 Stat. 885), on the first day of July, 1897, and have been operative ever since.

Of these rules the following is applicable to the case we are considering:

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rain-storms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator discretion as to what shall be "moderate speed" in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a fog, renders it not necessary to dwell upon the purpose and obvious wisdom of this second paragraph of the rule.

Mr. Justice Brown, an experienced admiralty lawyer, but repeated the expression of many cases, which finds new illustration in the mistake in this case made by the master, Lie, in determining the location and the distance of the "Beaver," when he said, in *The Umbria*, 166 U. S. 404, 408: "It is difficult to locate the exact position of a vessel in a fog, and still more difficult to determine her course and distance." And the Circuit Court of Appeals in this case expresses the result of testimony constantly met with in the trial of such cases when it says: "The cases are very numerous in which the approaching whistle which sounded far off was really very close, and in which the sound seemed to come from one direction, while in fact it came from another. Indeed, it is a matter of com-

mon knowledge that sounds in a dense fog are very deceptive."

It is enough to say that this second paragraph is an addition to the former rule for preventing collisions at sea, which the International Conference recommended, after full discussion by the most intelligent seafaring men of many nations; that, at the time of the collision, obedience to it was commanded by Act of Congress and by the law of the country under the flag of which the "Selja" was sailing, and that if it had been obeyed the collision would not have occurred.

By his own statement, as we have epitomized it, Lie, the master of the "Selja," confesses that when he first heard the whistle of the "Beaver" he realized that it was "forward of the beam" of his ship, and although it is plain that he was not able to ascertain the position of the vessel from which the danger warning came, for he thought it the whistle at Point Bonita, twenty miles away, yet he not only did not stop his engines, as required, but, on the contrary, he continued to run them for five minutes following at half speed (6 knots an hour) in thick fog, until each succeeding whistle of the "Beaver" sounding nearer than the one before, at length convinced him that it was the whistle of an approaching steamer.  But even then, when convinced that the danger signals which he had been hearing repeated at one minute intervals for five minutes were from an approaching steamer still "forward of his beam," he did not obey the rule by stopping his engines, but contented himself with reducing his speed to slow, three knots an hour, not out of deference to the rule of law, but because, as he says "I considered that six knots was not moderate enough under the circumstances," and this speed he continued for five minutes longer, until ten minutes past three, when, at length, he ordered his engines stopped, with the result, he is obliged to confess, that at 3.14, two minutes before

the collision, his ship still had steerage way upon her, "was not quite at a standstill," and a moment later the crash came. It is of no avail for this master to say that at the instant of the accident he thinks the momentum of his ship had been overcome, and that she was commencing to move backward in response to the "full speed astern" order, which had been given during the instant that had elapsed between the appearance of the "Beaver" through the fog and the coming of the ships together, for the evil had been done and the collision rendered inevitable.

When it is considered that the statement of the master of the "Selja" as to the moment when he gave the order to reduce speed from half to slow, and then from slow to stop, and then from stop to full speed astern, are all but approximations, arrived at after the disaster to his ship had occurred, when every possible influence, conscious and unconscious, was operating to induce a recollection favorable to the conclusion he most desired, it is not possible in the administration of practical justice to avoid the conclusion that the effect of the wilful disobedience of this imperative and important statutory rule of law, which should have governed his conduct, continued as an effective force, operating on the movement of his vessel to the instant of collision, driving her forward steadily, even though in the last moments slowly, to the fateful point of intersection of the courses of the two ships.

Such a state of fact makes sharply applicable the conclusion of this court in *The Pennsylvania*, 19 Wall. 125: "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."

The record before us not only fails to show that the fault of the "Selja" might not have been one of the causes of the accident, or that it probably was not, or that it could not have been one of the causes of it, but, on the contrary, it clearly shows, as we have seen, that the negligent failure to observe the statutory rule contributed directly to cause the collision.

The case is not one for the application of refinements as to what would have been good seamanship without the rule, such as we are invited in argument to consider, nor is it a case for consideration of the doctrine of major and minor fault. Both of the masters were palpably negligent in respects which contributed directly to cause the collision; the negligence of each continued to operate as an efficient cause until the moment when the accident occurred, and we agree with the lower courts that the case is one in which the master and owner of the "Selja" must be left to suffer their self-inflicted loss.

The judgment of the Circuit Court of Appeals is

*Affirmed.*