## THE OZARK.

### DEERING et al. v. UNITED STATES.

(District Court, D. Massachusetts. March 30, 1922.)

No. 1891.

1. **Collision ⊜125—Testimony of crew as to signals of more weight than that of witnesses on other vessel.**

The crew of a vessel are in much better position to know what is actually done on board her than witnesses on another vessel, and their testimony as to her maneuvers and signals preceding a collision will usually be accepted, unless the court discredits it as untruthful.

2. **Collision ⊜82(1)—Naval vessel held in fault for collision with schooner in fog.**

A collision at sea at night in a fog between a naval monitor and a meeting schooner *held* due solely to the fault of the monitor in failing to stop on hearing the fog signals of the schooner ahead, as required by International Rules, art. 16 (Comp. St. § 7854); there being no good reason why she should not have done so.

In Admiralty. Suit for collision by Gardiner G. Deering and others, owners of the Schooner H. O. Barrett, against the United States, as owner of the steamship Ozark. Decree for libelants.

Stephen R. Jones and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for libelant.

Charles P. Curtis, Jr., Asst. U. S. Atty., of Boston Mass.

MORTON, District Judge. This is a case of collision in a fog between the United States monitor Ozark and the five-masted schooner H. O. Barrett. It occurred on the high sea off the capes of the Delaware, near Five Fathom Bank light vessel, shortly after 1 a. m. on April 19, 1917. This suit is brought under a special Act of Congress (41 Stat. p. 1639). The facts are as follows:

The Ozark was bound south, from New York to Tampico. She was about 250 feet long and about 50 feet beam, with a very low freeboard, so that her forward deck was awash, while she was under way. She entered the fog from 10 to 15 minutes before the collision, but did not reduce her speed, maintaining it at 10½ knots. Lookouts were posted at each end of her bridge, in her foretop, which was just aft the bridge, on the sides, and also on the after part of the vessel. A gun crew and a boat's crew were also on duty. On her bridge, besides the lookouts, were her executive officer and junior officer, who were in charge of the watch. The war was on at the time, and there had been reports of German submarines near the coast in the vicinity of the collision. These reports were regarded as in all probability without foundation, but it was deemed advisable to adopt all possible precautions against attack.

The regulations of the Navy Department gave the commander of the Ozark a very wide discretion as to what he should do for the safety of his vessel. R. S. § 1547 (Comp. St. § 2805); Naval Instructions, art. 2607, par. 12. Before entering the fog she was running without lights.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On entering it, her commander gave orders that she was to continue to run without lights and to maintain her speed, but was to sound the regulation fog signals. This was accordingly done. Shortly before the collision her officers heard fog signals from several steamers in her vicinity, two of them well forward of her beam. She nevertheless continued without reduction of speed. Then a faint sound, which later proved to be the horn of the H. O. Barrett, was heard slightly on the port bow of the monitor, blowing what were taken to be two-blast signals, which would indicate a sailing vessel on the port tack. The wind at that time was S. S. W., and a sailing vessel on the port tack would have been headed in a westerly direction. Shortly after getting this signal, the Ozark's speed was reduced to one-third speed and kept so for three minutes. Then her engines were stopped until she lost steerage way; then started again, first at one-third speed, and a few seconds later at two-thirds speed. Her helm, which had previously been ported, was put to starboard at this time, either in order to stop her swing or, as the libelant claims, to head her up against the other vessel's signal. Very shortly afterward the starboard light of the schooner was made out broad off the port side of the monitor, and the schooner coming on struck the monitor on the side almost at right angles, her bowsprit extending across the monitor's deck between the bridge and the forward turret. The vessels hung together for a considerable time, and the schooner was carried back alongside the monitor by the latter's forward motion. Eventually they were separated and the schooner was anchored. She was not so badly injured but what she was able to make port.

From the account of the accident given by the schooner, it further appears that she was running up the coast before the wind, her spanker boom off to starboard and her jigger boom off to port. The wind was light and her speed was not over 3 knots, probably rather less, certainly not immoderate. She heard the signals of the Ozark, but kept her course. When the vessels were close together, the monitor turned on all her running lights; as to this the witnesses on the monitor agree. The schooner kept her course and describes the collision substantially as the witnesses on the monitor describe it.

[1] It will be observed that there is much less dispute as to the facts than is usual in cases of collision in fog. The only important point on which there is serious conflict of testimony is as to whether the schooner was giving a three-blast signal or a two-blast one. As she was running free, she should have given three-blast signals, and the testimony of her officers and crew is that she was doing so. Both officers on watch on the monitor say that the signals were two-blast. In similar situations it has often been observed by admiralty courts that the crew of a vessel are in a much better position to know what is actually done on board her than witnesses on another vessel; and the account of a vessel's maneuvers and signals given by her own crew will usually be accepted unless the court discredits it as untruthful. It is clear on the testimony of the officers of the monitor that the signals from the schooner were but faintly heard and were at first recognized with difficulty. The schooner was clearly giving fog signals,

and it is unlikely that she would give false ones. Vessels may be, and they sometimes are, so careless as to give no signals at all, trusting to luck to hear those given by other vessels; but, if signals are in fact given, it is difficult to see any motive for not giving proper ones. In this case it is quite possible that the officers on the monitor were mistaken. I therefore find that the schooner was giving proper signals, and was free from fault.

[2] The remaining question is whether, upon such facts, the monitor should be held liable for the collision. The charges principally urged against her, although others are also made, are that she failed in respect of her lookout, and in not stopping her engines promptly, and was guilty of immoderate speed, and was at fault in turning to starboard after hearing the schooner's signals. She was too clearly at fault to require discussion, but for the extraordinary circumstances under which she was proceeding. Both under the Navy Regulations and under the common sense of the situation, it was the duty of her commander to navigate her with a paramount regard for her own safety. After that it was his duty to navigate her with due regard for the safety of other vessels and as near as possible in conformity with the International Rules (Comp. St. § 7834 et seq.)

Several minutes before the collision her navigating officers heard what turned out to be the schooner's fog horn one or two points on their port bow; i. e., nearly ahead, and apparently no great distance away. They judged it to be a two-blast signal, but it was impossible to be certain about that. At that time the monitor was making 10½ knots. Both by the International Rules, if they be regarded as applicable, and by the requirements of prudent navigation apart from the rules, she ought to have stopped her engines at once. There was no good reason why she should not have done so, but she continued at full speed for three minutes before stopping them, and thereby brought herself so near the other vessel that the collision occurred. No provision of the International Rules with regard to the handling of vessels seems to me more helpful in preventing collision in fog than that which requires the immediate stopping of engines when a sound is heard ahead. In many cases a slight delay in doing so makes the difference between safety and disaster, and it is a requirement which it is almost always, as it was here, practically possible to comply with.

In Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 296, 37 Sup. Ct. 270, 272 (61 L. Ed. 726), it is said:

"The most cursory reader of this rule (article 16) must see that * * * the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him."

And the steamer concerned was held at fault for not stopping her engines immediately on hearing the fog signal of another vessel forward of her beam. Leading cases in the District Courts to the same effect are The El Monte, 114 Fed. 796; The Georgic, 180 Fed. 863. The English courts have adopted the same view. The Konig Willem I, [1903] P. D. 114; The Rosalia, [1912] P. D. 109. The authorities are collected and the discussion of article 16 at the International Ma-

rine Conference in 1889 is reprinted in La Boyteaux's Rules of the Road at Sea, p. 88 et seq.

In my opinion the Ozark was at fault for failing to stop her engines as soon as the schooner's fog horn was heard, and I so find. It is not necessary to discuss the other faults charged.

Let a decree be entered, adjudging the Ozark solely at fault for the collision, and referring the case to an assessor to state the damages.