## THE PEMAQUID.

### MAINE CENT. R. CO. v. AUSTIN.

(Circuit Court of Appeals, First Circuit. June 6, 1922. Rehearing Denied June 8, 1923.)

No. 1538.

1. **Collision ⬅83—Steam vessels both held in fault for collision in fog.**
    Each of two steam vessels *held* in fault for collision in a dense fog, when meeting in a 300-foot channel, for violation of Inland Rules, art. 16 (Comp. St. § 7889), where each heard the whistle of the other forward of her beam, but continued at full speed until immediately before collision.

2. **Collision ⬅85—Violation of rules presumptively a fault.**
    The presumption of fault arising from a plain violation of the rules should not be regarded as overcome, except on clear and convincing proof.
    Morton, District Judge, dissenting to denial of rehearing.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in admiralty for collision by Calvin Austin, receiver, against the steamer Pemaquid; the Maine Central Railroad Company, claimant. Decree for libelant, and claimant appeals. Reversed.

For opinion below, see 255 Fed. 709.

Foye M. Murphy and Edward E. Blodgett, both of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellant.

Nathan W. Thompson, of Portland, Me., and Edward S. Dodge, of Boston, Mass., for appellee.

Before BINGHAM, Circuit Judge, and MORTON, and MORRIS, District Judges.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BINGHAM, Circuit Judge. This is an appeal from a decree of the District Court for the District of Maine in favor of the libelant, the owner of the steamer J. T. Morse, for damages sustained in a collision between the Morse and the steamer Pemaquid, which occurred in a thick fog on September 8, 1915, about 7:56 in the morning, at Field Ledge Buoy, No. 15, in Deer Island Thoroughfare.

[1] The Pemaquid was owned and operated by the Maine Central Railroad, carrying freight and passengers between the ports of Sargentville and Rockland. It was a single screw steamer of 409 gross tons burden, 132.5 feet long, 28 feet beam, and capable of a speed of 11 or 12 knots. On the morning of the accident, she left Stonington Landing at about 7:48, bound westward through Deer Island Thoroughfare for Rockland. On leaving Stonington Landing, she proceeded at full speed on her usual course, W. ¾ S., to pass between the buoys on Allen's Bar. At that point her course was changed to W. ⅞ S. for Field Ledge Buoy, No. 15. On passing over Allen's Bar, she slowed down for about 40 seconds to get her departure for Field Ledge Buoy, and then proceeded at full speed until just before the collision, when she slowed and reversed her engines. In the neighborhood of Allen's Bar she heard the Morse giving the salute signals at Mark Island.

Mark Island is at the western entrance to Deer Island Thoroughfare. The distance from the Island to Field Ledge Buoy is five-eighths of a mile, from Field Ledge Buoy to Allen's Bar six-eighths of a mile. and from Allen's Bar to Stonington Landing four-eighths of a mile—a total distance of 1⅞ miles. On the morning of the accident the fog was so thick that, according to the evidence of the Morse, an object like Mark Island or the Pemaquid could be seen only when 300 or 400 feet away, and one like Field Ledge Buoy, a black spar rising some 12 feet out of the water, only from 50 to 100 feet.

The J. T. Morse is a side wheel passenger steamer of 780 gross tons, 190 feet long, 31 feet beam, and capable of a speed of from 12 to 14 knots. She was running between Rockland and Bar Harbor. On the morning of the accident, she left Rockland for Bar Harbor, intending to touch at various intermediate points. Although there was a thick fog, she proceeded at full speed across the bay to Mark Island, except for 10 seconds, when she slowed her engines as she passed the Vinalhaven, after which she continued at full speed (14 knots) into Deer Island Thoroughfare. At Mark Island she sounded a salute of three signals. When abreast of the island, she heard the whistle of the Pemaquid, and knew the steamer was coming westward through the Thoroughfare; that being the only passage for vessels bound west. At this point the Morse was put upon a course, E. by N. ⅞ N., for Field Ledge Buoy.

There was a light breeze from the south, and the tide was about half flood. The distance from Mark Island abeam to Field Ledge Buoy was usually run by the Morse in 2½ minutes, and this morning she proceeded at full speed for 2 or 2½ minutes, when the signals to slow, to stop, and to reverse were given just before the collision. The

channel in the neighborhood of Field Ledge Buoy is about 300 feet wide, and it was at this place that the collision occurred.

In the court below it was found that the Pemaquid was proceeding at an immoderate speed, in violation of the statute governing vessels in a fog (article 16 of the Inland Rules [Comp. St. § 7889]); that after slowing down at Allen's Bar and hearing the whistle of the Morse the Pemaquid continued at full speed on her course for Field Ledge Buoy, keeping well on the port side of the Thoroughfare, when her captain knew the Morse would keep over on her starboard side of the Thoroughfare, and would be at Field Ledge Buoy at about the time the Pemaquid would arrive there; that, although the fog was thick, there was nothing to prevent the Pemaquid, had she kept to her starboard side, from seeing the buoy at a sufficient distance across the Thoroughfare to avoid all danger of collision with the Morse.

It also found that, before the Morse saw the Pemaquid, she had stopped and reversed her engines at full speed astern, and at the time of the collision had lost her headway and was moving astern; that she kept well over to the starboard side of the Thoroughfare, leaving sufficient room for the Pemaquid to pass, if she had kept to her starboard side.

It was not seriously contended in the court below, and is not here, that the Pemaquid was free from fault in proceeding in a fog through the Thoroughfare at 11 or 12 knots an hour, nor that the finding of the court below that she was at fault in this respect was not warranted by the evidence. As to this matter we agree with the conclusion of the District Court. The burden of the claimant's contention is that the Morse was also at fault in proceeding through the Thoroughfare in a fog at 14 knots an hour, knowing, as she did, that the Pemaquid was approaching from the east, and that it was customary for the Pemaquid, on leaving Allen's Bar, to set her course for Field Ledge Buoy, which she had to pick up to get her course out through to Mark Island, and that it was necessary to pass within 50 to 100 feet of the buoy in order to pick it up in the fog.

The evidence is undisputed that the accident took place near Field Ledge Buoy, and that the Morse, at the time of the collision, had reached the buoy, which marked the intersection of the courses on which the steamers were approaching each other at the time of the collision; that the Morse had entered the Thoroughfare at Mark Island, proceeding at full speed, and continued in that manner for at least 2 minutes, if not longer, when, the evidence on the part of the Morse is, signals to slow, stop, and reverse were given in close succession just preceding the collision.

In considering the question whether the Morse was at fault for not having reduced her speed on leaving Mark Island, the approaching steamers being on intersecting courses, the court below said:

"The propriety of seamanship cannot be judged by the chance that two vessels may or may not reach a point of intersection at the same time, but rather by the question whether their speed can be stopped before they arrive at the point where their courses intersect"

—but found that the Morse was not within the rule, saying:

"In the case before me I have found that the Morse was not only stopped before arrival at the point of intersection, but that she was actually going astern."

In view of the evidence, we do not see how the court below could have concluded that the Morse had been "stopped before arrival at the point of intersection" and "was actually going astern" at the time of the collision. Whether she had overcome her headway and started astern at the time of the collision or not, she evidently had not been able to overcome her headway before she reached the point at which the courses of the steamers intersected, for the evidence shows that she had reached that point and that the collision occurred there while she was advancing or backing.

But we are not satisfied that the Morse, at the time of the collision, had lost her headway and was moving backward. The evidence on this point on behalf of the Morse was of an unsatisfactory character, and seems to us insufficient to overcome the presumption of fault arising from the fact of her having proceeded through the fog at the immoderate rate of 14 knots an hour down to almost the moment of the collision, if she was not excused from complying with article 16 by some "special circumstances" recognized by article 27 (Comp. St. § 7901); for it is upon this evidence that the court below found that, if she was in fault for violating article 16, paragraph 1, her violation of that rule was not a fault contributing to the accident.

The Morse contends that she was relieved from the burden imposed by article 16, even though she proceeded through the Thoroughfare at full speed; that, on account of the density of the fog, she was obliged to keep her speed in order to enable her to pick up Field Ledge Buoy and get her course for Allen's Bar; that the danger of losing her way in the fog and going ashore was greater than the danger of collision with the approaching vessel, and excused her for proceeding at an immoderate speed through the fog. But we think that the danger of collision between vessels approaching at full speed in a fog, in a narrow channel not more than 300 feet wide, so outweighed the Morse's danger of losing her way, through possible failure to pick up Field Ledge Buoy, as not to warrant her holding her speed in disregard of article 16. Furthermore, as she was behind her regular schedule time more than three-fourths of an hour, we think this fact had quite as much to do with her proceeding through the Thoroughfare at full speed as the possible danger of losing her way from a failure to pick up Field Ledge Buoy.

Neither do we think that the court below was right in its conclusion that the officers of the Morse were correct as to the Pemaquid's location at the time they heard her whistle forward of their beam on their arrival at the entrance to the Thoroughfare at Mark Island. They undoubtedly were right in their conclusion that the Pemaquid was proceeding westerly through the Thoroughfare this side of Stonington, but where this side of Stonington was a matter which they surely had not ascertained. The court below found that they acted upon the supposition that the approaching steamer was—

"in the Thoroughfare about at a point not far distant to the westward of Stonington, and, on this supposition, they assumed that they had time to reach Field Ledge Buoy before the Pemaquid could arrive there."

If there is anything established by the evidence in this case, it is that they were clearly mistaken in this supposition, and that, if they had not been, the accident in all probability would not have occurred. The evidence shows that the Pemaquid, a vessel whose capacity under full speed was from 2 to 3 knots slower than the speed of the Morse, must have been at a point not slightly this side of Stonington, but this side of Allen's Bar (a half a mile or more nearer than was supposed), when the officers of the Morse heard her whistle forward of their beam; otherwise, the Pemaquid could not have reached Field Ledge Buoy when the Morse arrived there.

[2] We are therefore of the opinion that the Morse had not ascertained the location of the Pemaquid, and was at fault in not complying with the second paragraph, as well as the first paragraph, of article 16, and, as above stated, that the evidence on the part of the Morse was not of such clear and convincing character as to overcome the presumption of fault due to her failure to observe the statutory rules, or to establish that her failure in either of these respects did not contribute to the accident. The presumption of fault arising from the violation of rules of this character should not be regarded as overcome, except upon clear and convincing proof—certainly not when the testimony as to what occurred at about the time of the collision, given by the officers of the ship that has violated the statute, is as conflicting as it was in this case, where they testified, not only at variance with one another, but contradicted themselves. The Providence, 98 Fed. 133, 38 C. C. A. 670; The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123; The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726.

As the damages claimed to have been sustained by the Pemaquid have not been assessed, and when assessed all the damages sustained by the respective vessels should be apportioned, the case must be remanded to the District Court for further proceedings.

The decree of the District Court is reversed, and the cause is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the appellant.

## On Rehearing.

After giving due consideration to the arguments and briefs of counsel, we think the conclusion reached in our opinion handed down in this case on June 6, 1922, should not be disturbed, and that the petition should be denied.

The decree of the District Court is reversed, and the cause is remanded to that court for further proceedings not inconsistent with the opinion passed down June 6, 1922, with costs to the appellant.

MORTON, District Judge (dissenting). I concurred in the original decision with hesitation, and upon further consideration it seems to me

that we were wrong in rejecting the concurrent findings of fact of the board of inspectors and the District Judge. The evidence is very conflicting, and I do not think a case of clear error on their part is made out. See Lake Drummond Canal Co. v. Roper Lumber Co., 252 Fed. 796, 164 C. C. A. 636. Both of them found that the Morse was moving backward at the time of the collision. If so, her previous speed becomes immaterial, except upon the theory that she had not completely backed out of the Pemaquid's half of the "stopping distance," which leaves the case as one in which the Morse's fault was at most doubtful and slight as compared to the Pemaquid's, and the doubt had been resolved in the Morse's favor by the District Court. Again I think it cannot be said that the District Court was clearly in error in such a finding.