## THE CAMPANIA.

## THE MOMBASSA.

District Court, E. D. Louisiana.    July 19, 1927.

### No. 18279.

**1. Collision ⬅81, 82(1)—Collision in fog held due to fault of outgoing vessel, failing to stop and having lookout on pilot house (Inland Rules art. 16 [Comp. St. § 7889]).**

Collision in Chesapeake Bay in a dense fog, mist, and rain, with a visibility not exceeding 100 feet, between the steamships Mombassa, going out from Baltimore, and the Campania, coming in, both sounding fog signals, *held* due solely to faults of the Mombassa in failing to stop and navigate carefully after hearing fog signals ahead from an unknown position, as required by article 16 of Inland Rules [Comp. St. § 7889], but in proceeding after a stop of two minutes from full speed, at a speed of 5 to 7 knots until 4 minutes before she struck the Campania, which was stopped or moving astern, and also in having her lookout stationed on top the pilot house 140 feet back, instead of in the bow.

**2. Collision ⬅81—Placing lookout 140 feet back of bow in dense fog held gross fault.**

Placing the lookout 140 feet back of the bow of a steamship navigating in a dense fog, mist, and rain, when it is impossible to see more than 100 feet in any direction, is a gross fault.

In Admiralty. Suit for collision by Fortunato Maggiolo, master of the steamship Campania, against the steamship Mombassa, and cross-libel. Decree for libelant, and dismissing cross-libel.

George Forbes, of Baltimore, Md., and Terriberry, Young, Rault & Carroll, of New Orleans, La., for libelant.

Denegre, Leovy & Chaffe, of New Orleans, La., for respondent.

BURNS, District Judge. Libelant, as master and bailee of the Italian steamship Campania, charges liability to the respondent, British steamship Mombassa, for damages resulting from a collision at or about 9:27 o'clock a. m., on December 5, 1925, in Chesapeake Bay, off Point No Point, which the respondent, Steamship Mombassa Company, Limited, as claimant and owner of the Mombassa, denies. By cross-libel the respondent charges liability to the plaintiff for damage to the Mombassa, which, by answer, is denied.

These charges and countercharges of negligence are substantially to the same effect. Each insists that its opponent was wholly and solely at fault by not being properly manned, not blowing proper fog signals, not giving due regard to fog signals, not navigating with due caution under the conditions prevailing, not keeping a proper lookout, in failing to seasonably stop and reverse, and in violating the Inland Pilot Rules.

The issues were tried with meticulous care by very competent, experienced proctors. The record of testimony is voluminous. Each detail of testimony, much of which is confusing and contradictory, was elaborately discussed, both in oral argument and both briefs. After careful consideration of the evidence, in the light of these arguments, I have resolved the conflicting evidence as indicated by the following findings of fact:

[1] The time of collision was 9:27 o'clock a. m., correct Eastern standard time. The Campania's clock was correct, whilst that of the Mombassa and of the Maryland Branch Pilot Lewis were 10 minutes fast.

The exact place of collision is in doubt. It was, however, at a point some 3 miles, more or less, below or south of Point No Point, in the fairway of Chesapeake Bay. The weather was overcast with misty rain. There was a dense or thick general fog or misty rain at the time and place of collision, with a southeast wind of a velocity of 25 miles, more or less. Because of the thick fog or mist, the range of visibility was perhaps less than half a ship's length, certainly less than 200 feet. The tide was at flood, or at least at slack water, but not at ebb.

The vessels came in collision, in this dense, low-lying, general fog or mist, by the impact of which the stem of the Mombassa pierced or penetrated the port bow of the Campania some 12 feet abaft her stem, to a depth of 8 or 10 feet, leaving the impress of the former's bow in the hull of the latter. This was a V-shaped opening or hole about 20 feet wide at the top, narrowing down to nothing at the bottom.

The Campania, after the collision, went down by the head, drifting northward on up the bay with the wind and tide. She was saved from sinking by her forward water-tight bulkheads. She was maneuvered to the beach several miles above Point No Point, assisted by a government revenue cutter, whence she was finally towed in to Baltimore, which was her destination. The Mombassa stood by several hours, until authorized by the revenue cutter Apache, which came upon the scene, to resume her voyage to New Orleans.

Prior to the collision, both ships were seaworthy with respect to their hulls, machinery, tackle, and apparel.

The Campania was approximately 400 feet long, with a beam of 52 feet, having a

right-hand propeller. She was fully laden with cargo of kainit in each of her four holds, drawing 24 feet 6 inches mean. She was bound from Antwerp to Baltimore, to make a charter party, the cancellation date of which was 20 days off. On December 4th, at about 7:50 p. m., she passed Smith's Point on a N. ¾ E. course, about 1¼ miles off, thence on a N. W. course at full speed, or about 10 knots, through fog, to make safe anchorage some 5 miles above, or north of Smith's Point. At about 7:30 a. m. of December 5th, as the fog was lifting, she proceeded with a branch pilot in charge on a north by west course up the bay at slow speed, blowing regulation fog whistle signals, because the fog soon settled thick. At 9:20 a. m. the lookout, stationed in the eyes of the ship at the bow, and the five men, including the master and the pilot on the bridge, heard a ship's whistle dead ahead in the dense fog. The Campania blew a long blast, ported the helm, put the engines full speed astern, blowing three short blasts to indicate this maneuver. She then heard the second and only other whistle of the obscured ship on her own port bow. The Campania having, by the maneuver just stated, during 6 or 7 minutes, arrested headway, she was stopped, or nearly so, if not moving sternward, when she saw off her port bow the forward port of the Mombassa appear out of the fog, at a distance of 50 to 75 feet. She received the blow within some 45 seconds thereafter. This was at 9:27 a. m.

The Mombassa, also a three island ship similar to the Campania, was 385 feet long by 50 feet beam. She was light, in ballast, drawing 15 feet 3 inches aft. She was bound out of Baltimore for New Orleans for cargo. She had left her wharf, after discharging cargo, on December 4th, at 8:15 a. m., stopped at quarantine to fumigate until 2:35 p. m., but did not leave until 6:30 p. m., owing to a thick fog. At 7:30 p. m., on account of dense fog, she was compelled to anchor again at Cut-Off Channel. She was also in charge of a branch pilot. At or about 2:05 a. m. of December 5th she left her anchorage, when the misty weather appeared to be clearing; the same, however, being overcast with misty rain and fog. She proceeded on various courses, generally south by east, down the bay, at various speeds, averaging 8½ knots per hour, during the 7½-hour run to the point of collision. During the last hour and a quarter preceding the collision, or from 8:15 a. m., the weather, or fog, or mist was setting in thick. She was blowing regulation fog signals. Her lookout was not in the bow of the

ship. He was on top of the wheel house, more than 140 feet abaft her bow. At 9:11 o'clock a. m. and thereafter she constantly heard fog signals ahead. Her engine operations were: Stop, 9:12 a. m.; slow ahead, 9:14 a. m.; stopped, 9:33 a. m.; full astern, double ring 9:36 a. m.; stop 9:38 a. m. The collision occurred at 9:37 a. m. (This time is corrected 10 minutes.) The Mombassa did not see the Campania earlier than 9:36 a. m.

Each vessel became visible and was seen at approximately the same time by the other when at a distance of 50 to 75 feet apart. It is more likely that the lookout on the Campania's bow saw the Mombassa because the lookout of the Mombassa was stationed farther off, as stated. The engines of the Mombassa were reversed probably less than 45 seconds before the impact. She had been running slow ahead for 19 minutes previous to the stop at 9:33, before which she had been at full speed. The intervening engine stop at 9:12 was but for 2 minutes, when she resumed headway at slow ahead. Since she was a 9 to 10 knot ship, at full speed, 6 to 7 at half speed, and 4 to 5 at slow speed, she was probably going from 5 to 7 knots at 9:33 a. m. when the engine was stopped. This was just 3 minutes before the order full speed astern was given, and this was to be executed in less than one minute before the collision. The Mombassa was therefore still under considerable headway at the time of collision.

[2] My conclusion is that the Mombassa is liable for the damages growing out of the collision. She was at fault in failing to place a lookout as low and as far forward as possible. Her failure to do so is aggravated by the fact that she was proceeding in a thick general fog or mist, with occasional rain, where and when it was impossible to see beyond perhaps less than 100 feet in any direction. Under such conditions, the placing of a lookout approximately 150 feet back of the bow constituted gross negligence. The authorities seem to coincide in the opinion that, where the range of visibility is diminished by inclement weather, as by fog, rain, or mists, or dashing spray, where the ship is in motion, or during dark or cloudy nights, the proper place for the lookout is at the bow, at the extreme forward end of the ship, or as it is generally expressed "in the eyes of the ship." The Ottawa, 3 Wall. 268, 18 L. Ed. 167, and cases there cited.

The Mombassa was guilty of a greater fault in failing to proceed at a moderate speed while in a dense fog. She was at full speed for at least 7 and perhaps 10 minutes

after first hearing the fog signal of an approaching vessel forward of her beam. She then, by her own record, stopped the engines for but 2 minutes, and resumed slow speed before her headway could have been much diminished, running thus for 19 minutes, up to within 4 minutes of the collision. She was all the while hearing forward of her beam the fog signal of a vessel the position of which was not ascertained. This negligence was the primary, or proximate cause of the collision. It was in direct violation of the Pilot Rules for Inland Waters, article 16 (Comp. St. § 7889).

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

Where a vessel is in a narrow fairway, in a dense fog, and proceeds at full speed for from 7 to 10 minutes after hearing a first fog signal forward of her beam, and hearing continuing regulation fog signals thereafter, stops her engine for only 2 minutes, thus barely reducing her full-speed headway, and then again takes up headway, even though at slow speed, for 19 more minutes, or just within 4 minutes of actual collision, with a vessel ahead, the position of which was not and could not be ascertained until within less than half a ship's length, such action is in open defiance of the legal regulations, as well as the dictates of reason and common prudence.

I am not construing the antecedent acts of the pilot and master of the ship in navigating the Mombassa at excessive speed in a dense fog prior to hearing the fog signals of the Campania forward of her beam as the proximate or even the remote cause of the collision; but I am taking into consideration all of the testimony of these two as well as that of the second officer, who was on the bridge, and of the sole lookout, who was improperly stationed atop the wheel house, in testing their credibility as witnesses with respect to what they were doing and how they were doing it, after the Campania's fog signals were heard. I am convinced that they did not tell the truth when they claimed to have seen the Campania at a distance of 1,000 or 1,200 feet, and that they saw her swerve from a course parallel to theirs to starboard, and so came across their bow. What they really saw was her position

after she had been stopped, with her engine reversed some 6 or 7 minutes, and probably taking up sternway, whereby her right hand propeller kept her stern swinging to port, and her head to starboard; whereas, the Mombassa's headway was not yet checked. She was still probably making 5 or 6 knots when she suddenly thrust herself out of the fog in view of the other vessel, which was then less than half a ship's length away.

It was what they did after the fog signals of the Campania were heard that condemns or acquits them. They were then in the danger zone, and the decision of the case turns upon what was then done by both vessels.

I have carefully scrutinized the evidence for the Campania, and, as will appear from my conclusion upon the facts, I am satisfied that she was operated throughout in keeping with the rules governing the situation in which she was, and in good seamanlike manner. I am satisfied that she did not hear the fog signals of the Mombassa as early, in point of time, as the Mombassa heard hers, because of the wind direction; but upon hearing the first fog signal ahead she stopped her engines, reversed, and indicated her maneuver to the other vessel by a three short blast signal. This was precisely what the Mombassa should have done, and negligently failed to do.

In Lie v. San Francisco & P. S. S. Co., 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726, the Supreme Court held that a negligent breach of this statutory duty, contributing directly to cause a collision, is not excusable upon the ground that the vessel was navigated in accordance with what would have been good seamanship, had not the duty been imposed. It was article 16 of the International Regulations (Act Aug. 19, 1890, 26 Stat. 320; 29 Stat. 885) then being considered. This article is identical with article 16 of the Inland Rules, which I have already quoted. In referring to that article, the court, through Mr. Justice Clarke, said:

"The most cursory reader of this rule must see that, while the first paragraph of it gives to the navigator discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a fog, renders it not necessary to dwell upon the purpose and obvious wisdom of the second paragraph of the rule."

He then quotes Mr. Justice Brown in The Umbria, 166 U. S. 404, 408, 17 S. Ct. 610, 41 L. Ed. 1053, referring to the repeated expres-

sions in many cases recognizing the necessity of the rule for preventing collisions at sea, because of the difficulty to locate the exact position of a ship in a fog, and still more the difficulty to determine her course and direction. He then proceeds to condemn the master of the Selja, who, like the master and pilot of the Mombassa, had been hearing fog signals of an approaching ship forward of his beam repeated at one-minute intervals, but did not obey the rule by stopping his engines, and contented himself with reducing his speed to slow, which he continued for 5 minutes, "when, at length, he ordered his engines stopped, with the result * * * that at 3:14, 2 minutes before the collision, his ship still had steerage way upon her, 'was not quite at a standstill,' and a moment later the crash came." The case is different, principally in that the negligence of the Mombassa is more pronounced.

It was the imperative duty of the Mombassa to have her headway checked to a moderate speed immediately after the first fog signal was heard. When the engines were stopped, at 9:12, the ship was at full speed, or nearly so. She then picked up, within 2 minutes, at slow speed, and was so kept for full 19 minutes, making perhaps 7 or 8 knots through the water. This was the direct, efficient cause of the collision. This was the primary fault. Her failure to have a proper lookout in the bow of the ship, and failure to reverse until within the moment of collision, were gross faults contributory thereto. The circumstances disclosed by the record seem to justify here the application of the rule that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor.

In The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053, the United States Supreme Court applied this rule, under circumstances less aggravated, saying:

"Indeed, so gross was the fault of the Umbria in this connection [going at full speed in a fog after hearing fog signals ahead, as did the Mombassa] that we should unhesitatingly apply the rule laid down in Alexandre v. Machan [The City of New York] 147 U. S. 72, 85 [13 S. Ct. 211, 37 L. Ed. 84] and The Ludvig Holberg, 157 U. S. 60, 71 [15 S. Ct. 477, 39 L. Ed. 620] [etc.]."

If the parol and documentary evidence left any doubt as to which vessel was stopped, and which was under considerable headway, the doubt could be readily resolved under the doctrine res ipsa loquitur. The clean V-shaped cut in the hull of the Campania and the condition of the Mombassa's bow is eloquent, though mute, evidence of the fact that the former was stopped, or backing away, whilst the latter piled into her with considerable force, and this is corroborated by the overwhelming preponderance of credible expert evidence in the record.

A decree in favor of the libelant, and against the respondent, on the main demand, and also dismissing the cross-libel, may be entered accordingly.