### THE KIDDOO.

### THE SEVERANCE.

### Nos. 774, 818.

District Court, D. Massachusetts.

June 11, 1941.

Thomas H. Walsh, of Boston, Mass., for Diamond S. S. Transp. Corporation.

Foley & Martin, of New York City, for United Petroleum Transport, Inc.

McLELLAN, District Judge.

These libels involve a collision between the Steamship "Severance", a collier owned by Diamond Steamship Transportation Corporation, and the "S. T. Kiddoo" (hereinafter called the "Kiddoo"), a diesel tanker owned by United Petroleum Transport, Inc. The collision occurred near the mouth of Boston Harbor on October 16, 1938, at about 2:26 P. M.

In No. 774, the libellant is the Diamond Steamship Transportation Corporation and the action is against the "Kiddoo". The libel asserts that on October 16, 1938, a collision occurred between the "Severance" and the "Kiddoo" about one and one-half miles northeast of Graves Lighthouse and about one-half mile off Graves Whistling Buoy. Allegedly, the "Severance" was severally damaged in an amount exceeding $12,000, and alleged the collision was due in no way to any fault of the "Severance", but was due entirely to fault of the "Kiddoo", and of those in charge of her at the time. It is averred that the "Kiddoo" was at fault in the following respects:

"(a) In that she was proceeding at too great a speed in fog.

"(b) In that she was giving wrong whistles.

"(c) In that she did not heed the signals of the S. S. 'Severance'.

"(d) In that she did not stop and reverse her engines.

"(e) In not having a competent master in charge of her at the time.

"(f) In not having a competent helmsman properly stationed and attentive to his duties.

"(g) In not having a competent lookout properly stationed and attentive to his duties.

"(h) In directing her course across the bow of a vessel.

"(i) In improperly blowing signals for the high seas while in inland waters."

In its answer, filed in No. 774, the United Petroleum Transport, Inc., as claimant of the "Kiddoo", admits that a collision took place between the above named vessels at the time and place alleged in the libel, but denies that it was caused by any fault of the "Kiddoo" or those in charge of her, alleging, on the contrary, that it was due solely to the fault, neglect and want of care on the part of the "Severance", in the following respects:

"1. In that those in charge of her operation and control were careless, incompetent and inattentive to their duties.

"2. In that the steamship Severance was improperly manned and equipped.

"3. In failing to have a lookout properly stationed and attending to his duties.

"4. In failing to navigate with due regard for the safety of other vessels.

"5. In failing to take into consideration the existing conditions.

"6. In proceeding at an immoderate rate of speed under the circumstances.

"7. In failing to heed the fog signals of the S. T. Kiddoo.

"8. And in other respects which will be pointed out on the trial of this action."

In No. 818, the United Petroleum Transport, Inc., libels the "Severance", making the same allegations of fault on the part of the "Severance" and those in charge of her as it made in its answer in No. 774, as set forth above. Damages amounting to $6,000 are alleged. The answer of the Diamond Steamship Transportation Corporation, as claimant of the "Severance", denies fault on the part of its vessel, and makes the same allegations of fault as to the "Kiddoo'" as are made in its libel in No. 774, as set out above. Thus both cases present substantially the same issues as to the respective fault of the vessels involved.

### Findings of Fact.

On October 16, 1938, the "Severance", a single screw steamship, about 368 feet long, with a 54 foot beam, and drawing about 24 feet loaded, left an East Boston shipyard at 11:38 A. M. bound for Newport News. At the time, the vessel was light and drew approximately 14 feet aft and 5½ or 6 feet forward. The bridge was located amidships, about 140 feet from the bow. At sailing time, visibility in Boston Harbor was about three-quarters of a mile. Soon after passing the anchorage off East Boston, however, the wind changed and fog set in, reducing visibility to from 500 to 800 feet. The vessel's speed was at once reduced to slow speed ahead. In this fashion, she continued down the harbor despite the fog, arriving at Finn's Ledge at 1:51 P. M. At times visibility was as low as from 200 to 300 feet. Soon after reaching Finn's Ledge, speed was increased to half speed ahead to gain steerageway to clear three ships anchored there. After leaving Finn's Ledge, the "Severance" took a course east by north, which she held with minor variations until the accident. She reached Graves Whistling Buoy, which she passed at a distance of about one-half mile, at 2:24 P. M. Her average speed between Finn's Ledge and Graves Whistling Buoy was slightly greater than four knots. Her engines were at slow speed ahead during all this period, except when they were placed at half speed ahead to avoid the ships anchored at Finn's Ledge, as heretofore found, and except between 2:13 P. M. and 2:22 P. M., when they were also at half speed ahead.

Some seven or eight minutes prior to reaching Graves Whistling Buoy, a signal from another vessel was heard some two and one-half or three points on the starboard bow. This vessel eventually proved to be the "Kiddoo". According to all witnesses from the "Severance", the first signal was two blasts of a whistle, and other similar signals heard at times until shortly before the accident, interspersed with signals of one blast. It is agreed that both vessels were in inland waters at the time. Under the rules governing inland waters, there is no signal consisting of two blasts on a whistle which may be used by vessels out of sight of one another in a fog. Under International Rules, however, not here applicable, a steam vessel under way, but stopped, and having no way upon her, is directed to sound, at intervals of not more than two minutes, two prolonged blasts, with an interval of about one second between. The testimony of those on the "Severance" as to the signals heard conflicts sharply with the witnesses from the "Kiddoo", all of whom testified that their vessel at all times sounded the regulation prolonged single blast, although some of these witnesses also testified that the single blast was sounded as often as four times in a minute, in order to give other ships a better chance to obtain bearings. On all the evidence, and with hesitation, I find that the fog signals blown by the "Kiddoo" were at all times a single prolonged blast as required by the rules.

On hearing fog signals from the "Kiddoo", the "Severance" did not at once stop her engines, but continued, first at half speed ahead and later at slow speed ahead. The Master testified that this was done because he understood the Kiddoo's signals to mean that she was stopped. He also testified, however, that the second signal heard was a little more aft than the first and the third somewhat closer to the bow, which indicated that the "Kiddoo" was getting closer. In any event, the "Severance" did not change to slow speed ahead until four minutes prior to the collision. Her engines were not stopped until a minute before, when they were placed full speed astern. By that time, the "Kiddoo" was in sight, the vessels were within perhaps three hundred feet of one another, and it was

late to avoid a collision. The effect of reversing the engines on the "Severance" was to throw her bow to the right. The Master was of the opinion that other than for this motion, his vessel was stopped when the two boats came together, but I find that she was still making some small headway.

The bow of the "Severance" struck the port side of the "Kiddoo" about thirty feet from the bow. The damage to the "Severance" was to her bow, the bow plates being bent to port, so that in a photograph taken head on immediately after she had been placed in dry-dock, her bow appeared bent in a curve instead of appearing straight up and down, the greatest deviation occurring at a point three or four feet above the waterline.

The diesel tanker "S. T. Kiddoo" is 167 feet long and has a 32 foot beam. Her engines and bridge are aft. On October 16, 1938, she was bound for Revere, Mass., from Newark, N. J., carrying a load of gasoline. On the previous evening, she had anchored in the vicinity of Boston Light vessel, because of dense fog, and had remained there until 1:35 P. M. on October 16th, when the fog began to clear and radio reports indicated clearing in Boston Harbor. At 1:35 P. M., she weighed anchor and started in towards the harbor. Nearing Graves Whistling Buoy, fog shut in. The speed of the "Kiddoo" was then somewhat reduced, and she continued on her course, which was north-northwest. Between the time she left her anchorage and the time of the collision, she had covered approximately five and one-half nautical miles in about fifty minutes, so that her average speed was something in excess of six nautical miles per hour. Her maximum speed is about nine knots.

■ When the fog shut in, the "Kiddoo" began to give regular fog signals, as heretofore found. About seven or eight minutes prior to the collision, fog signals of a vessel which proved to be the "Severance" were heard forward of the beam. The second time this signal was heard, the "Kiddoo" was stopped according to her crew, and then continued on her course, her engines giving a kick whenever necessary to maintain steerageway. Just what speed she was making in this manner, however, is not altogether clear. I have no doubt, however, and I find, in the light of all the evidence, including the maximum speed of the "Kiddoo", the distance covered between the time she weighed anchor and the time

she collided with the "Severence", the testimony of those on board the "Severance", the manner in which the collision occurred, and the way in which her records were kept, that her speed remained greater than the testimony of her own crew would of itself indicate, and was in fact immoderate under the circumstances.

Three minutes before the collision, those on the "Kiddoo" heard the sound of water at the bow of the "Severance". Somewhat later, she came in view, headed directly for the middle of the "Kiddoo" on her port side. The "Kiddoo's" wheel was then put hard to the right, and her engines run at full speed ahead for a few seconds and then put full speed astern. This caused the bow of the "Kiddoo" to swing away from the "Severance", so that she was struck only a glancing blow. Despite evidence from the "Kiddoo's" crew that she too was stopped at the time of the collision, I find that she still was under considerable head way, but was turning to the right, away from the "Severance". This conclusion is supported by the character of the damage done to both vessels.

Both vessels were properly manned, had competent Masters and competent men at the wheel. There was a lookout properly stationed on both vessels up to the time of the collision, except that the lookout on the "Kiddoo" was ordered aft when a collision seemed unavoidable. Since the "Kiddoo's" life boats were stationed aft, near the bridge, and she was loaded with gasoline, no criticism can be made of this order.

■ On all the evidence, I find the "Severance" was sounding proper fog signals. On conflicting evidence, and with some hesitation, I find that the "Kiddoo" was sounding proper fog signals also.

■ On all the evidence, I find the "Severance" at fault in that she was proceeding at a speed greater than was warranted under the conditions prevailing at the time, and in that she did not stop and thereafter proceed with caution upon first hearing fog signals from the "Kiddoo". I further find that the fault of the "Severance" in these respects was a substantial cause of the collision.

■ On all the evidence, I find the "Kiddoo" at fault in that she was proceeding at a speed which was immoderate under the circumstances, and in that she failed to navigate with proper caution after hearing fog signals from the "Severance". I fur-

ther find that such fault was also a substantial cause of the ensuing collision.

### Conclusions of Law.

On the basis of the foregoing findings of fact, including the ultimate findings just stated, both vessels were at fault.

Article 16 of the Rules for Coast and Connecting Inland Waters, which governed both vessels at the time, provides:

"Art. 16. Speed of vessels in fog. Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

The requirement that "a steam-vessel hearing, apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines" etc., is strictly enforced. In Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 37 S.Ct. 270, 272, 61 L.Ed. 726, the Court, after quoting similar provisions of the International Rules, says: "The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator, discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a fog renders it not necessary to dwell upon the purpose and obvious wisdom of this second paragraph of the rule."

The "Severance", it appears clearly from her log, and from the testimony of her Master and other officers, did not stop when first she heard signals from the "Kiddoo", but on the contrary continued at half speed ahead for several minutes thereafter. In this she must be held at fault.

There are many cases dealing with the proper speed of vessels navigating in fog. In some cases, it is said that vessels must proceed sufficiently slowly so as to be able to stop upon sighting another vessel, assuming the latter to be traveling at a proper speed also. See The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053. On the other hand, since it may at times be impossible to see more than a few feet, it has been said that a vessel in such a fog should proceed as slowly as possible and still maintain steerageway. See The Colorado, 91 U.S. 692, 23 L.Ed. 379; Hughes on Admiralty, page 263. In The Sagamore, 1 Cir., 247 F. 743, 752, the Circuit Court of Appeals for this Circuit pointed out that a vessel has no right to maintain a speed sufficient for steerageway, if conditions are such as to make such speed too great for safety, particularly after the presence of another vessel has been ascertained by hearing her fog signals. In such cases, it is said, speed should be further reduced by stopping and starting alternately. The Court says: "In a fog so dense as existed in this case the right to maintain steerageway and the obligation to go so slow as to be able to avoid a vessel which can be sighted approach inconsistency; but both rules are to be applied so far as is possible."

To multiply precedents would serve no useful purpose. In the present case, on the facts found, it is clear that neither vessel, after hearing the other, slowed. down sufficiently under the circumstances. The "Severance" did not stop her engines at all until just before the collision and the "Kiddoo", while she apparently stopped her engines one or more times, still proceeded more rapidly than she should in view of the fact that she was in the main channel in and out of Boston Harbor and knew that the "Severance" was somewhere in the vicinity. There was visibility of at least 200 to 300 feet at the time. And yet both vessels, although aware that they were approaching each other, were going too fast to avoid a collision when they came into view of one another. This cannot be held to be a compliance with the rule that they shall go "at a moderate speed, having careful regard to the existing circumstances and conditions" and that after hearing the fog signal of a vessel apparently forward of her beam, each should "stop her engines, and then navigate with caution until the danger of collision is over."

Both vessels were at fault, and the fault of each was a substantial cause of the collision. The cases are of such a character that the damages should be equally divided, irrespective of the degree of fault, in accordance with the American Admiralty rule upon the subject. The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91.