### THE WALTER D. NOYES.

### THE BARRANCA.

(District Court, E. D. Virginia.   October 25, 1921.)

1. **Collision ⬅100(2)—Ship navigated by unlicensed master down narrow channel in fog, at full speed, without proper lookout, without stopping engine on hearing fog signal of approaching vessel, held at fault.**

   Master, who navigated heavily laden vessel without a license, in violation of Rev. St. § 4401 (Comp. St. § 8153), down a narrow channel, without a proper lookout, in a dense fog, at full speed, and who failed to stop the engine and navigate with caution when he heard fog signal of approaching vessel, as required by 26 Stat. 320, art. 16 (Comp. St. § 7854), held negligent, rendering the vessel at fault for collision with the approaching vessel.

2. **Collision ⬅100(2)—Ship navigated in narrow channel, in dense fog, held at fault for collision caused by its failure to stop engine and proceed with caution, on hearing fog signal of other vessel.**

   Vessel navigated parallel with and within 50 feet of narrow dredged channel, used, according to the custom of a port, by vessels going in opposite direction, after being warned of approaching fog, and which, on finding itself within the channel after dense fog had set in, proceeded up the middle of the channel, and did not stop its engines and proceed with caution on hearing fog signals of approaching vessel, as required by 26 Stat. 320, art. 16 (Comp. St. § 7854), held at fault for collision with approaching vessel.

3. **Collision ⬅82(2)—Difficulty of navigating without sufficient headway not excuse for failure to stop engines and navigate with caution on hearing fog signal of other vessel.**

   Under 26 Stat. 320, art. 16 (Comp. St. § 7854), requiring a vessel, on hearing fog signal of other vessel, to stop its engine and navigate with

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

caution until danger of collision is over so far as the circumstances of the case admit, a vessel is not excused from complying with rule under normal conditions, merely because of the difficulty of navigating without sufficient headway, since the loss of steerageway must have been contemplated in adoption of rule.

**4. Collision ⊂⇒144—Rule as to division of damages applied, where negligence on both vessels operating to moment of collision.**

Where the negligence of both vessels continued to operate up to the moment of collision under circumstances making both vessels equally culpable, the rule as to division of damages must be applied.

In Admiralty. Cross-libels by R. B. Drake, master of the steamship Barranca, against the steamship Walter D. Noyes, and by the Crowell & Thurlow Steamship Company against the steamship Barranca. Decree applying rule as to division of damages ordered. •

Baird, White & Lanning and E. R. Baird, Jr., all of Norfolk, Va., for libelant Drake and the Barranca.

Blodgett, Jones, Burnham & Bingham and Edward E. Blodgett, all of Boston, Mass., and Hughes, Vandeventer & Eggleston and Floyd Hughes, all of Norfolk, Va., for the Walter D. Noyes and Crowell & Thurlow S. S. Co.

GRONER, District Judge. Cross-libels were filed on behalf of the Barranca and the Noyes, growing out of a collision between them which occurred near the Thimble Shoal dredged channel in lower Chesapeake Bay on April 27, 1920. Both vessels were badly damaged. The Barranca, a freight and passenger vessel, 4,124 tons gross, 372 feet long, was at the time of the collision on a voyage from Liverpool to Jamaica, via Norfolk for bunkers. The Noyes, also a large vessel, 4,387 tons gross, 354 feet long, was on a voyage from Norfolk (Sewell's Point) to Boston, loaded with coal. At 1:32 p. m. of April 27th the Barranca, having stood in the Virginia Capes, took on a licensed pilot and immediately proceeded full speed (12 miles an hour) for Norfolk. On the bridge with the pilot were the master and second officer, with a quartermaster at the wheel.

In the neighborhood of 7 miles northwestwardly from the point where the pilot boarded the Barranca the government had cut a channel 600 feet wide and about 3½ miles long, extending from a point southerly from the tail of the Horseshoe northwestwardly to Thimble Shoal. This narrow channel was marked with black buoys on the south side and with red buoys on the north side; the buoys on each side being approximately a mile and a quarter to a mile and a third apart. The depth of this channel was 35 feet, and for over a mile on each side for its entire length there was a depth of from 25 to 30 feet of water. The purpose of the pilot of the Barranca was to run outside of and to the south of the cut channel; the custom of the port being to leave the same largely for the use of loaded vessels going out.

Both the pilot and master of the vessel testify that the course taken brought them, at about 1:55, opposite and on the south side of the bell buoy marking the southeastern prolongation of this dredged channel, and that they passed this buoy on the ship's starboard side, about 50

feet away, the course of the vessel being then parallel with the south-ern line of the channel; that in consequence of this they picked up and passed 50 feet to starboard, a thick fog having then set in, the two suc-ceeding black buoys, numbered 3 and 5, and intended to pass No. 7 on the same course, but that just before reaching No. 7 the lookout re-ported to the pilot that this buoy was close under the port bow of the vessel, in consequence of which the course was altered half a point to starboard to enable the ship to pass the buoy without fouling. The result of this maneuver was to bring the buoy on the port side, about 50 feet away, and to bring the course of the ship diagonally across the narrow channel, so that when she reached the other side she would pass out at a point a little easterly of red buoy No. 8, and about a mile and a quarter below the point of entrance.

Both the pilot and the master of the Barranca testify that it was not until the steamer was about midway the channel, and three or four minutes after passing buoy 7, that the first fog signal from a vessel approaching in the opposite direction—which afterwards turned out to be the Noyes—was heard. The evidence of the master of the Bar-ranca is that between the first signal heard and the collision just three minutes elapsed; the pilot, that the time between the first signal and the collision was five or six minutes. The vessels at the time were ap-proaching one another at the rate of about a mile in four minutes, so that, if the testimony of the master of the Barranca be correct, the dis-tance between the two vessels when the first signal was heard was three-fourths of a mile, and if the testimony of the pilot be correct the dis-tance was a mile to a mile and a quarter. At the time the first signal was heard the engines of the Barranca were rung down to dead slow (4 to 5 miles), and a minute later, when another signal from the ap-proaching vessel was heard, were stopped. A moment later the Noyes was discovered on the Barranca's port bow, coming out of the fog ap-parently at full speed.

The collision occurred within a few seconds thereafter, in spite of the fact that both vessels, as soon as the danger was discovered, went full speed astern; the bow of the Barranca striking the starboard side of the Noyes abreast the bridge. The stem of the Barranca was badly twisted to port, the bridge and a good deal of the upper works of the Noyes carried away, and a considerable indentation made at the point of contact. The pilot of the Barranca places the position of the ves-sels at the time of the collision just on the northern edge of the dredged channel, between buoys 6 and 8; the master of the Barranca, to the north and entirely out of the channel. But inasmuch as, in the dense fog then prevailing, there were no physical objects by which a verifica-tion of the position of the vessel could be made, and inasmuch, also, as she materially changed her position before the lifting of the fog, so that no subsequent confirmation could be had, the evidence in respect to her position at the moment of impact is of necessity based on no other evidence than her course and speed from the time she passed buoy 7 to the time of the collision.

On the part of the Noyes, the evidence is she left the Sewell's Point dock at 12:50, at 1 o'clock straightened out in the channel, and that

thereafter she maintained full speed ahead up to the moment the vessels came in sight; that the fog set in when she arrived about off, or a little below, Thimble Shoal light; and that thereafter and until the moment of the collision she sounded fog signals every minute. The master, the second officer, and the quartermaster were on the bridge, which was uninclosed and approximately 100 feet from the bow of the vessel. Apparently there was no lookout-man on the fo'castle head, and it is admitted that the navigator of the Noyes, although holding a master mariner's license, had failed to obtain a pilot's license covering the navigation of Hampton Roads and Chesapeake Bay.

All of the witnesses for the Noyes testify that their vessel passed into the dredged channel about midway between the two entrance buoys, and that the course steered from that point on was the exact course of the channel; that black buoy 11, on her starboard or southern side, was passed from 150 to 300 feet away, and the next buoy, which was No. 9, from 100 to 150 feet. All the witnesses for the Noyes likewise agree that practically from the moment of entering the cut channel they heard the fog whistles of the Barranca; that their ship was on the starboard or right-hand side of the channel, where it should have been, and where the law required it to be, and so continued up to the moment when the Barranca came in sight; that they first observed the Barranca when at a point distant between one-half and two-thirds of the way between buoys 9 and 7; that she was then to the south of and about 1,000 feet away from the line of the dredged channel, standing, according to the diagram and drawing of the captain of the Noyes, in a direction almost at right angles with the channel, and about four points on the Noyes' starboard bow. The wheel of the Noyes was immediately put to starboard, and her engines put full speed astern in an unsuccessful effort to avoid the collision which occurred immediately thereafter. The vessels separated in the fog, and the Noyes came to anchor to the southward of the channel, with No. 7 buoy bearing northeast by east.

Precisely the same criticism of the evidence for the Noyes of the point of impact may be made as was made in the case of the Barranca — that is to say, that there were no visible physical objects to definitely establish the point of collision, and that the evidence as to her then position is predicated wholly upon the course and speed of the ship with regard to objects which she had passed prior to the collision. The evidence shows that both ships at the moment of discovering the peril maneuvered to avoid the collision, and it is insisted on behalf of each that the maneuver of the other was unwise and contributed to the collision. Whether this be true or not is, in my opinion, unnecessary to determine, since the occasion was one of emergency, in which the law does not require the same deliberate judgment demanded under normal conditions.

Inaccuracies in the evidence of each side affecting the place of collision may be found without difficulty. For instance, it may be pointed out that, according to the testimony of the pilot of the Barranca, conceding as accurate the point at which he says he boarded the ship, the course laid out by him, viz. northwest by west one-half west, would

have taken the Barranca to the northward of the dredged channel at or near the eastern entrance to the same, a course which, it may be suggested in passing, would have been the safer and better from every point of view. Or if the course of the Barranca as given by the helmsman of that vessel is correct, and the point where the pilot boarded the ship again be conceded, the Barranca would at all times have been considerably south of the line of black buoys, and the collision could only have occurred at all upon the theory that the Noyes was entirely out of and far to the southward of the channel at the time of the impact. On the other hand, the positions of the ships just before the collision and when they first became visible to one another—as shown on the diagram made by the captain of the Noyes—if correct, would have made a collision impossible; for this clearly shows that the Barranca was then at least four points on the starboard bow of the Noyes, 1,000 feet away, and the time required by her to steam this 1,000 feet, with the Noyes wheel to starboard, even with her engines then reversed, would have carried the latter well beyond the danger point before the Barranca had reached and crossed her course.

[1] Under these circumstances it becomes necessary, by a process of elimination and reconstruction, to determine, from such facts as are definitely ascertainable, what the actual circumstances and conditions were. In the case of the Noyes, no particular difficulty obtains in this respect, for the reason that her negligence was patent and inexcusable. She was being navigated, in violation of law (section 4401, R. S. [Comp. St. § 8153]), by a master who, whether or not he possessed the necessary qualifications, was unsupplied with the necessary license. His utter disregard of this law is inexcusable from any point of view, and perhaps as much so from the fact that carelessness, rather than necessity, is his only excuse. None of his officers, either, were better off than himself in this respect. In addition to this dereliction, he was navigating a heavily laden vessel down a narrow channel, without a proper lookout, in a dense fog, and at full speed.

His attempted excuse of his conduct in the latter regard, namely, that to have reduced his speed would have so diminished his control of his vessel as to have made navigation dangerous, requires no other comment than to recall that it is the invariable, if futile, effort at justification when misfortune occurs. It was in the teeth of good seamanship and safe navigation, and to this, of course, should be added his further disregard of the rule, absolute in its terms (26 Stat. 320, art. 16 [Comp. St. § 7854]), in failing to "stop her engines, and then navigate with caution" when he heard the approaching fog signals of the Barranca, until he should have ascertained definitely the position of that vessel. All of these acts of negligence being admitted, and no question being made that they directly and proximately contributed to the happening of the collision, it follows that the Noyes must be held at fault.

[2] In the case of the Barranca, although the circumstances tending to show either negligence in navigation or violation of the rules are perhaps less patent, enough is shown, if the evidence on behalf of that vessel alone be considered, to justify the conclusion that, but for the

failure in both respects of those in charge of her navigation, the collision would have been avoided. At the moment when she started from a point opposite Cape Henry a light haze gave warning of a possible fog further up. She was light, and for 10 miles of her course, at least, could have been safely navigated for at least a mile to the northward or southward of the cut channel without danger. By a custom well known to the Virginia pilot in charge of her navigation, the duty was imposed on her of avoiding this channel. Her course might have been laid with equal safety to the north or south of it. The pilot chose, he says, although his compass course indicates otherwise, the southern route, and if he had continued on that course, giving, as he should, ample room to outcoming vessels, no collision would have occurred; but instead he so navigated his vessel as to bring her course within 50 feet of the southern line of the channel, apparently making no allowances for the currents or the slightest deviation of his helm, which might put him in the channel and directly in the path of outward bound ships.

When he came abreast the first buoy a dense fog set in. Prudent navigation, it seems to me, under the circumstances, would then have impelled him to a more southerly course, and one at least to some extent more removed from the danger zone. Regardless of this caution, he continued, at a speed of approximately 7 miles an hour, on a course parallel with the dredged channel and not 50 feet away, and when opposite buoy No. 7 found himself actually inside the channel, faced with the necessity either of stopping and backing out, crossing over to the other side, or starboarding his helm, and, as he expresses it, again crossing the danger line. It is true that up to this time he claims not to have heard any of the fog signals of the Noyes, although the evidence of the crew of that vessel is that their fog signals had been sounded from the moment of their entrance into the channel 2 miles or more below, and their admission that from that time on they heard without difficulty the fog signals of the Barranca.

But, conceding that those on board the Barranca for some reason failed at first to hear the answering signals of the Noyes, which I think the evidence establishes undoubtedly were sounded, the navigation of the Barranca was, in my opinion, unjustifiable in the maneuver that then was made. For even though, to avoid fouling buoy No. 7, it may have been necessary to change her course slightly, the obligation, as soon as this danger was passed, which at most was less than half a minute, was again to change her course and put her back again outside the channel, a movement which might easily have been accomplished as soon as her bow had passed the given point; and particularly is this true if the evidence be accepted that up to that time no approaching signals had been heard. Or if, finding himself, by a miscalculation, in the channel, as was the case, her navigator had hard ported his helm and gone entirely across and out of the channel on the northern side, he would have required less than a minute to put his ship beyond the point of danger, for he had just come from the Capes, and knew and could properly guard against such dangers, if any, approaching from that direction. He did neither of these things, but continued up and

diagonally across the channel, and over a course which kept his vessel in or near the middle of the channel for a mile and a quarter, and for at least eight minutes of time, before she was again in a position where she had a right to be.

The failure of the Barranca to adopt one or the other of these alternatives was, in my opinion, a cause contributing directly to the collision; but, unfortunately, this is not all. There was sea space for the safe passage of the approaching vessel, and the danger might yet have been avoided, had either vessel observed the rules binding on both under the conditions then obtaining. The negligence of the Noyes has already been pointed out. The Barranca heard the Noyes' signal while in mid-channel, according to her master three minutes, and according to her pilot five or six minutes, before the vessels came in sight. The fog was thick. Both officers knew that the signal was from a vessel approaching in the narrow channel, and both likewise knew that under these conditions the law imposed upon them the absolute duty (The Selja, 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726), immediately of stopping the engines and navigating the vessel with caution until the danger of collision was passed, and this they failed to do. Instead they took a chance—a chance which, perhaps, in a majority of cases would have availed to avoid the collision, but which, unluckily, turned out to be the wrong thing in the circumstances which prevailed. They heard the signal and changed the ship's speed to dead slow ahead (4 or 5 miles) and ported her helm; a moment later they heard another signal and stopped her engines; but a moment later the damage was done.

Giving full credence to the evidence on behalf of the Barranca as to the exact periods elapsing between the several changes in the operation of that vessel, it is nevertheless not possible to avoid the conclusion that the effect of her disobedience of the rule of law (26 Stats. 320) requiring her, at the moment of first hearing, forward of her beam, the fog signal of a vessel, the position of which was not then ascertained, to stop her engines until the danger of the collision, by the disclosure of the position of the approaching vessel, had passed, was contributory to the accident. And not only does the rule impose this positive duty, but it further requires that they should remain stopped until the position of the other vessel is ascertained. Had this been done, who can say that the Noyes would not have safely passed, and the collision been avoided.

[3] But it is insisted that the rule is not absolute; that the language, "so far as circumstances of the case admit," should be so construed as to relax the rigor of the rule under some conditions, and that such an interpretation would bring the "circumstances" here within its terms. I think not, for here the difficulty of navigating without sufficient headway, which alone is offered as a reason for the failure to obey the rule, can hardly be so classed. Conditions here were normal, and the loss of steerageway, inevitable under the circumstances, must have been in contemplation in the adoption of the rule, for otherwise it would be meaningless and a contradiction in terms.

Good seamanship and cautious navigation, regardless of the rule, it seems to me, should, in the circumstances here detailed, at once have

suggested to a prudent navigator the necessity of overcoming as far as possible the momentum of his vessel, lest he run into, rather than out of, danger, and then by constant, continued, and repeated blasts of the whistle, not a minute apart, but every three or four seconds, indicating to the approaching vessel the danger of further proceeding on her course. That the collision would have been avoided had this been done, is hardly to be doubted, for it would have accomplished the double purpose (a) of stopping the headway of the Barranca, except for which the collision would not have occurred; and (b) of warning the approaching vessel, so that even her heedless navigator would have been admonished of his folly.

It follows, therefore, from what has been said, that the Barranca was where she should not have been in the first place, and in the second place was, after the danger of the collision became imminent, navigated in disregard of the statutory rule, and was therefore a contributing cause of the collision.

[4] The negligence of each vessel continuing, as it did, to operate up to the moment of collision, and being under the circumstances stated equally culpable, the rule as to division of damages must be applied, and a decree will be entered accordingly.