# THE OHIOAN.
# THE BALDROCK.
# THE RAMOS.

Nos. 13858, 13944.
District Court, E. D. New York.
Aug. 31, 1934.

Kirlin, Campbell, Hickox, Keating & McGrann and Wm. H. McGrann, all of New York City, for American Hawaiian S. S. Co. and the S. S. Ohioan.

John R. Stewart, of New York City, proctor for Eastern Transp. Co.

Foley & Martin and Jas. A. Martin, all of New York City, for T. J. Hooper, owner of the barge Ramos.

CAMPBELL, District Judge.

The above-entitled suits were brought to recover damages alleged to have been caused by collision.

These suits were by stipulation tried together, and, as they arise out of the same happening, but one opinion will be required.

In the first above-entitled suit, the steamtug Baldrock and Eastern Transportation Company were, on the petition of American Hawaiian Steamship Company, impleaded under the Fifty-Sixth rule of the Admiralty Rules (28 USCA § 723).

On evidence which at some points is conflicting, I find the facts as follows:

At the times hereinafter mentioned, T. J. Hooper, the above-named libelant in the second above-entitled suit, was a resident of the city of Baltimore, state of Maryland, and was the managing owner of the barge Ramos.

At the times hereinafter mentioned and at the time of the trial, the American Hawaiian Steamship Company, the libelant in the first above-entitled suit, was a corporation duly organized and existing under and by virtue of the laws of the state of New Jersey, and did at the times hereinafter mentioned and at the time of the trial own and operate the steamship Ohioan.

At all the times hereinafter mentioned and at the time of the trial, Eastern Transportation Company was a corporation duly organized and existing under the laws of the state of Maryland, and at said times owned and operated the steamtug Baldrock, and said corporation does not maintain an office for the transaction of business within this district, nor do any of the officers reside in this district, but it owns certain property and chattels which, during the currency of process herein, were within this district and within the jurisdiction of this court.

The steamtug Baldrock herein proceeded against was, during the currency of process herein, within the port of New York and within the jurisdiction of this court.

The barge Ramos was, prior to the happening hereinafter described, tight, staunch, strong, and in all respects seaworthy and properly manned and equipped.

The steamship Ohioan was, prior to the happening hereinafter described, tight, staunch, strong, and in all respects seaworthy and properly manned and equipped.

On June 24, 1933, the steamtug Baldrock got under way from Virginia Capes with the loaded barges T. J. Hooper, Catonville, and Ramos in tow, in the order named, bound for New York and New England ports.

The steamtug Baldrock was 142 feet in length between perpendiculars, about 38 feet beam, and about 15 feet in depth, with a tonnage of about 437 gross tons.

The barge T. J. Hooper was 267 feet in length, 49.6 feet beam, and 25 feet depth.

The barge Catonville was about 274 feet in length and 48 feet beam.

The barge Ramos was about 227 feet in length, about 38 feet beam, with a draft of 19.6 feet, and a crew of three men.

After passing out of the Capes, hawsers were let out to sea length, that is, about 225 fathoms between the tug Baldrock and the barge T. J. Hooper, 200 fathoms between the barge T. J. Hooper and the barge Catonville, and 200 fathoms between the barges Catonville and Ramos.

About 10 fathoms of hawser were used in making fast on each barge, so that the length of the hawser from the bow of one barge to the stern of the barge ahead was 180 fathoms.

The length of the tow from the stem of the tug Baldrock to the stern of the barge Ramos was about 4,400 feet, over two-thirds of a marine mile.

At about 10:30 o'clock on June 27, 1933, the morning of the collision, Scotland Lightship was observed on the port side of the tug Baldrock and her tow, the distance as estimated by libelant's witnesses varying between 1 and 2 miles. There was also observed a vessel at anchor between Gedney Channel and Scotland Lightship, and another vessel at anchor between Gedney Channel and Ambrose Channel.

The fog rapidly increased, and the master of the Baldrock, in order to avoid danger and seek an anchorage to the westerly of

Scotland Lightship, again swung the tow around under a port helm, that is, to seaward. At that time the visibility was about ½ a mile.

The distance to seaward of the tow increased in making the turn, and, when finally on the northwest course for an anchorage, the tow was about a mile and three-quarters to the southward and eastward of Scotland Lightship.

Fog signals were continually sounded by both the tug Baldrock and the barge Ramos, the last barge in the tow, and at all the times in question, on the day in question, fog signals on Scotland Lightship, Ambrose Lightship, and at Sandy Hook were being sounded and distinctly heard on the tug and barges.

While the Baldrock was proceeding on the northwest course, seeking an anchorage to the westerly of Scotland Lightship, at a speed of about a mile an hour over the ground, which was not more than sufficient to maintain steerageway, a one blast fog signal, repeated several times, was heard by those on board the tug and tow.

The steamship Ohioan, a steel, single screw cargo steamship 407.7 feet long, 53.7 feet beam, 5,153 gross, and 3,147 net tons register, on the 26th day of June, 1933, at 5:21 o'clock p. m., left Newark on a voyage from the West Coast for Philadelphia and Boston, and proceeded as far as Gravesend Bay, but the fog set in and she had to anchor at 7:13 p. m. The following morning, June 27, 1933, at 7:05 a. m., she hove up her anchor to proceed on her voyage, but at 7:15 a. m. she again anchored because the fog came in thick. About 10:08 o'clock a. m. it commenced to lighten up, and the Ohioan proceeded out and through Ambrose Channel, and, after leaving Ambrose buoy, her course was south and then south by east, the times given for such movements of the Ohioan being daylight saving time.

When the Ohioan left Ambrose Channel buoy, those on board could see about a mile and a half. Scotland Lightship was picked up when about a mile and a half away.

The Ohioan passed the Luckenbach and one of the Bull Line ships at anchor between Ambrose buoy and Scotland Lightship. In proceeding down Ambrose Channel, the weather had been partly clear, and then patches of fog. The Ohioan intended to pass Scotland Lightship 1,000 feet off on her starboard hand. About 11:18 o'clock a. m.

Eastern standard time the fog set in, and the Ohioan began to sound fog signals. Fog signals were then being sounded by Ambrose Lightship, Sandy Hook, and Scotland Lightship. The witnesses called on behalf of the Ohioan say that they heard no whistles other than those of the Ohioan, except the pilot of the Ohioan, who said he heard the fog signal of the Scotland Lightship.

The engines of the Ohioan were full speed ahead from 12:13 o'clock p. m. to 12:26 o'clock p. m. daylight saving time, which was one minute before they say they observed the Ramos, then half speed ahead. The Ohioan had three speeds; full speed was 11½ miles an hour, half speed 6½ miles an hour, and slow speed 4 miles an hour.

The Ohioan continued on with her engines at half speed, sounding fog signals.

The Ohioan could not have dropped from full speed to half speed between the time the engines were reduced to half speed and the time they were reversed. With the vessels in the positions described, the steamtug Baldrock, the barge Ramos, and the steamship Ohioan sounding fog signals, as well as Scotland Lightship, Ambrose Lightship, and Sandy Hook, which were heard on the Baldrock and her tow, the vessels were proceeding.

To those on the tug and tow fog signals, which it now appears were sounded by the Ohioan, appeared to be sounded by an outbound vessel, at some point forward of the beam and to the starboard side of the tug.

The tug Baldrock and barge Ramos continued to sound fog signals, as they had been doing from the time the tow started to make its turn about to seek an anchorage.

Shortly thereafter, the steamship Ohioan loomed out of the fog heading on a diagonal course for the starboard side of the tow. Those on the barges fix the distance of the Ohioan, when first observed, at ½ mile, but I believe that is too high an estimate. The master of the Ohioan fixes the distance of the Ramos, when first reported, at 700 feet, and I believe that was too low an estimate. The tug Baldrock and the barge Ramos continued sounding fog signals until the Ohioan was about 200 yards from the Ramos, when it became obvious that unless the Ohioan changed her course to port, there would be a collision between the Ohioan and the Ramos.

The Ramos and the two other barges sounded alarms.

During all this time the tug was moving forward at a speed of 1 mile an hour over the ground.

The tug had not seen the Ohioan, but from the alarms concluded that something had gone wrong with the tow. She signaled the head barge to cast off the towing hawser, and then signaled the barges to anchor.

The Ohioan continued to come on with considerable speed, between 8 and 10 miles an hour, although her master says she reversed her engines when about 200 yards from the barge Ramos, and at about 11:30 o'clock a. m., Eastern standard time, brought her bow into violent collision with the starboard side of the Ramos, about abreast of No. 4 hatch, the stem of the Ohioan cutting into the side of the Ramos for a distance of about one-half of her width, and also damaging the Ohioan.

The barge Ramos rapidly filled and her captain and his family left by means of the barge's lifeboat and the other two members of her crew were taken off by the Ohioan's lifeboat. The captain of the Ramos and his family remained in their lifeboat until they were taken aboard the Baldrock. There is a conflict in the evidence as to whether the other two members of the crew of the Ramos boarded the steamer, but that does not seem to me to be of great importance, as they did finally board the Baldrock from the lifeboat of the Ohioan.

The towing hawser having been let go, the tug started back toward the tow, pulling in its hawser in the meantime, and arrived in the vicinity of the Ohioan and the Ramos in about twenty or twenty-five minutes. The barge at that time was rapidly sinking.

In a short time thereafter the barge sank at a point about a mile and three-quarters south one-half east from Scotland Lightship, and about one-half mile outside of the line from Navesink to Ambrose Lightship over to Rockaway Inlet, which marks the boundary of New York Harbor outside of which line the International Rules (33 US CA § 71 et seq.) apply.

The barge and her cargo were a total loss.

There is a sharp conflict in the evidence as to the point of collision, but I am convinced it was inside of line of the harbor, and that the Inland Pilot Rules apply.

Both the tug and the steamship had each other on the starboard hand when signals were first sounded, and both the barge and the steamship had each other on the starboard hand until just before the collision, when the Ohioan put her engines full speed astern, which threw her bow a little to starboard and changed the angle of contact to one almost at right angles.

From the facts as found, the fault of the steamship Ohioan is clear and unmistakable. She was moving at an excessive rate of speed. Her speed, when her witnesses say she first observed the Ramos, must have appreciably exceeded 8 miles per hour, which was more than half speed. She was not able to stop, and her stem cut in nearly to the middle of the barge, therefore she was not under control.

When her fog whistles were first heard by the tug Baldrock, the Ohioan was within the harbor line and bound by the Inland Rules, and so was the tug Baldrock.

The evidence convinces me that the tug Baldrock and the barge Ramos were sounding loud fog signals; that of the tug would carry 5 miles; and that is not in any way shaken by the testimony of the former fireman and cook of the tug Baldrock, and the former deck hand of the barge Catonville, called on behalf of the Ohioan. If those whistles were not heard by those on the Ohioan, she must have maintained an inefficient lookout. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126.

That the lookout on the Ohioan was not efficient is further shown by the fact that the witnesses called on behalf of the Ohioan, with the exception of the pilot, all denied hearing the fog signals from Scotland Lightship, Ambrose Lightship, and Sandy Hook, all of which were sounding fog signals at the time, and the pilot admitted hearing only the fog signals sounded by Scotland Lightship.

Be that as it may, the steamship Ohioan was proceeding at an excessive rate of speed, more than half speed, in a fog at the entrance to the harbor, and could not stop in what her witnesses claim was 700 feet, which was nearly one and three-quarters ship lengths. In my opinion, visibility was 1,000 feet, about two and one-half ship lengths.

This was a clear violation of article 16 of the Inland Rules (33 USCA § 192), which provides:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

■ The tug Baldrock had a tow 4,400 feet long at the entrance to the harbor, and was bound to use extreme care. The Camden (D. C.) 283 F. 326.

■ The place of collision is in dispute, and cannot, with exact certainty, be determined; but there are circumstances from which it can be definitely determined that the collision occurred inside of the harbor line, and that the Inland Rules apply.

The position of the sunken wreck of the Ramos has been fixed by the Hydrographic Office, by bearings which were plotted on the chart by Capt. Moon and Pilot Johannessen, under the letters B and C, and are approximately 300 yards outside the harbor line. But that was not the place of collision.

The distance from Scotland Lightship to the harbor boundary is 1%o miles.

The master of the tug Baldrock testified (and I have made it all in Eastern standard time) that the Baldrock was abeam and 1 mile eastward of Scotland Light Vessel, at 10:30 o'clock a. m., then proceeded to a point 1 mile north of Scotland Light Vessel, when dense fog setting in, she hauled to the eastward at one mile an hour, turning the tow until she got on a northwest course a mile and a half or a mile and three-quarters south and east of Scotland Light, at 11 o'clock a. m., and at the time of the collision was one mile south one-half west of Scotland Light Vessel.

This story seems incredible, because if it be true, the Baldrock must have covered a minimum distance of 4½ miles in one hour, for her to be so far to the southward of Scotland Light Vessel, at collision, and yet her master says she was making only 1 mile an hour.

At the time of the collision, the ebb tide was running with a force of ½ or ¾ of a mile per hour.

The Ramos sank about one hour after the collision, therefore it seems to me that the Ramos must have drifted to the south at least ½ mile before she sank, and therefore, at the time of the collision, she must have been substantially north of the harbor line.

I am not unmindful of the fact that Capt. Russell, of the Ramos, testified that from the time the Ramos was struck, until the time she sank, her drift was not more than 100 yards. This at best was only an estimate, as he took no bearings, and considering his anxiety about saving his family, I cannot give great weight to that estimate, although I am certain he was telling what he actually believed to be true.

I am not greatly impressed with the reading of the automatic log of the Ohioan, which recorded %o of a mile at the time the line was cut, inasmuch as no one can definitely say that the line was severed by the steamer's propeller while reversing. At best it was but a conclusion, as such log lines are frequently cut by obstructions without any contact with a vessel's propeller.

The place where the barge Ramos sank, which has been definitely ascertained by a governmental agency, the time she remained afloat after being struck, and the direction and strength of the tide, furnish a much better guide for determining the place of the collision.

As I have before said, the whole length of the tug and tow was about 4,400 feet. The tug Baldrock did not stop, as article 16 of the Inland Pilot Rules required, when she heard the whistles of the steamer which afterwards proved to be the Ohioan forward of her beam, about four points on her starboard bow, but continued on and was still in forward movement with her tow at the time of the collision.

■ While the rule gives the navigator some discretion as to the first clause relating to speed, the command of the second paragraph is imperative. The Selja, 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726. The Baldrock cannot justify her failing to stop, because by stopping the towing hawser would get in her wheel, or that when she pulled ahead again, the strain on the slack hawsers would have parted them, as the sea was calm and the tug was stemming the tide. Donnell v. Boston Towboat Co. (C. C. A.) 89 F. 757, 760. That compliance with the rule would make navigation difficult because of insufficient headway is no excuse for nonobservance of the rule. The Walter D. Noyes (D. C.) 275 F. 690, 696.

The Baldrock was navigating in inland waters for a considerable period of time, at least one hour, prior to the collision, with hawsers of sea length.

Regulations for tows of seagoing barges within inland waters provide as follows:

"1. Tows of seagoing barges navigating the inland waters of the United States are

limited in length to five vessels, including the towing vessel or vessels.

"2. Hawsers are limited in length to 75 fathoms, measured from the stern of one vessel to the bow of the following vessel; and should in all cases be as much shorter as the weather or sea will permit."

■ This regulation has the force of a statute, and no discretion is allowed as to its observance. The Manhattan (C. C. A.) 186 F. 329.

■ On behalf of the Baldrock it is urged that neither violation of article 16 nor of Regulation No. 2 contributed to the collision, but the violation of the rule being plain, the Baldrock must show that the violation could not have contributed to the collision.

The navigation of the Baldrock, when she heard the fog signals of the steamer which afterward proved to be the Ohioan in a fog so dense that visibility was as low as a thousand feet, was at fault. The tug evidently assumed that she and the Ohioan were on parallel, or nearly parallel, courses, and that the Ohioan would clear the tow.

■ This was an assumption she should not have made; but should have stopped and waited until it clearly appeared that the steamer had passed astern and her signals were receding in the distance. The Conehatta-Lubrafol, 1928 A. M. C. 339, 341.

■ That both violations contributed to the collision seems to me to be clearly established. The length of the tow in a dense fog, at the entrance to the harbor, was a menace to navigation, and made it impossible for the Baldrock to know anything about, or to do anything for the barge Ramos when confronted by the Ohioan, and it was to make navigation in the harbor safer and reduce the dangers of collision that the regulation was made.

The failure of the Baldrock to stop when she heard the steamer's fog signals was certainly a contributing cause of the collision, because the evidence of the barge men is that when first observed the Ohioan was headed for the hawser between the Catonville and the Ramos, but that at the time of the collision, the stem of the Ohioan headed directly toward the No. 4 hatch of the Ramos, with which she contacted, going one-half way through the Ramos.

It is undoubtedly true that by reversing her engines, the stern of the Ramos went somewhat to port, and her bow to starboard, but that would have tended to cause the Ohioan to have cleared the Ramos, but for the fact of her forward movement, under the power of the tug, which contributed to the collision.

■ The failure of the tug to produce the second officer and lookout creates no presumption as to their testimony. The master of the tug knew that there was a steamer off to starboard, and did not need to be informed of that fact.

I am convinced that the Baldrock proceeded as soon as possible in going back to render assistance to the Ramos after hearing the alarm signals and sounding the signal for the barges to anchor, and picking up her hawser, and that there was not sufficient time after the Baldrock arrived in the vicinity of the Ramos to have beached her; and I am further convinced that the Ohioan left the scene of the collision before the Ramos sank. I conclude:

That the steamship Ohioan was negligently navigated at excessive speed, in a thick fog, by those for whose actions she was responsible, and brought her into contact with the barge Ramos, inflicting severe damage on the Ramos, which sank with her cargo on board, and both barge and cargo became a total loss, damaging the libelant, and that the Ohioan also suffered damage.

That the steamtug Baldrock negligently contributed to the collision of the Ohioan with the Ramos, by violation of article 16, and of Regulation No. 2 of the Pilot Rules, and that both the Ohioan and the Baldrock were at fault.

That the American Hawaiian Steamship Company, the libelant in the first above-entitled action, is entitled to a decree for one-half damages and one-half costs against the steamtug Baldrock and Eastern Transportation Company, with the usual order of reference.

That neither the libelant T. J. Hooper nor the barge Ramos, nor any one for whose actions they or either of them were responsible in any way, negligently caused or contributed to the damages caused to the libelant T. J. Hooper, or the barge Ramos and her cargo, in the second cause of action.

That T. J. Hooper, the libelant in the second cause of action, is entitled to the usual decree for half damages and half costs, each against the steamship Ohioan and against the steamtug Baldrock and her owner, Eastern Transportation Company, with the usual order of reference.

That decrees may be entered in accordance with this opinion. Settle decrees on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.