**STANDARD OIL COMPANY (N. J.), as owner of THE SS ESSO SPRINGFIELD, Libellant,**

v.

**THE WELLESLEY VICTORY, her engines, etc., and American Export Lines, Inc., Respondent. And cross-suit.**

United States District Court, S. D. New York.

July 30, 1954.

Kirlin, Campbell & Keating, New York City, for libellant and cross-respondent, Standard Oil Co., (N. J.), Raymond T. Greene, Ira A. Campbell, Stephen J. Buckley, New York City, of counsel.

Haight, Deming, Gardner, Poor & Havens, New York City, for respondent and cross-libellant, Walter A. Darby, Jr., New York City, John J. Mulcahy, Jr., Brooklyn, N. Y., of counsel.

CONGER, District Judge.

These actions arise out of a collision on January 30, 1947 between the S/S Esso Springfield, owned by the Standard Oil Company (N. J.), and the S/S Wellesley Victory, operated by American Export Lines, Inc. The collision occurred in fog a few miles south of Ambrose Light Vessel at about 2:05 in the afternoon.

Standard Oil filed a libel against the Wellesley Victory and American Export Lines, Inc. The latter answered and at the same time filed a cross-libel against the Esso Springfield and Standard Oil, which Standard Oil answered. The actions were thereafter consolidated for trial and decree.

The Esso Springfield is a steel, single-screw, steam-turbine tanker, 504 feet long and was built in 1944.

The Wellesley Victory is a single-screw, turbine steamship, 493.1 feet long and was at the time of the collision under bareboat charter to American Export from the Maritime Commission (owner).

The Version of the Esso Springfield

On January 30, 1947, the Esso Springfield, bound from New York to Baytown, Texas, in ballast, dropped her pilot at 1:17 p. m. and proceeded slowly in thick fog on a course about 150° true, sounding proper fog signals. The Master was on the bridge in charge of her navigation; the Third Officer was on watch on the bridge; a helmsman was at the wheel and a look-out was on the bow. Her engines had, since 1:17 p. m. been alternating between slow ahead and half ahead. While so proceeding a whistle was heard forward of the beam on the starboard side at 2:01 p. m. The engines were immediately stopped and the vessel continued to navigate with caution. A prolonged whistle blast was blown, and hearing no answer, the signal was repeated. Shortly thereafter, the Wellesley Victory was observed off the starboard bow. The engines of the Esso Springfield were immediately put full astern at 2:02 p. m. and a three-blast backing signal was blown. About a half minute later, the engines were put at emergency full astern. At 2:03 p. m., despite the efforts of the Esso Springfield to avoid collision by backing, the port bow of the Wellesley Victory, in the way of her anchor windlass, struck the bow of the Esso Springfield, causing damage to both vessels. The Wellesley Victory continued ahead aft-er the collision across the bow of the Esso Springfield and disappeared in the fog. Thereafter, the vessels communicated by radio and each stated that it did not need assistance.

The Version of the Wellesley Victory

On January 30, 1947, the Wellesley Victory was proceeding toward New York from Philadelphia, carrying about 6,500 tons of general cargo. At 10:57 a. m. visibility decreased to about 3 miles. The Captain gave the engine room "stand-by engines" orders, posted a look-out on the bow, and commenced sounding regulation fog signals. Visibility continued to decrease and at about 12:30 p. m. speed was reduced to 50 R. P. M., which was about 9 knots. About 1:55 p. m. a fog whistle was heard bearing about 3 points off the port bow of the Wellesley Victory which whistle appeared to be drawing to port and aft of the Wellesley Victory, indicating the whistle was on a parallel course headed south. As the Wellesley Victory was approaching Ambrose Light Vessel, the Captain ordered the First Officer to take over while the Captain took radio bearings on Ambrose. The First Officer was stationed at the open porthole in the center of the wheelhouse and the Third Officer was on the port wing of the bridge. At approximately 2:01 p. m., just as the Captain had completed taking radio bearings, he was told by the First Officer that the fog whistle appeared to be closing. As he stepped back from the chart room to the wheelhouse, the other officers on the bridge reported, and the Captain heard, two-blast signals, which signals bore about 3 points on the port bow. At 2:03 p. m., the two-blast signals appeared to be getting louder so that the Captain ordered reduction of speed to 20 R. P. M., a speed of about 3 knots. About 1 minute later, the Esso Springfield appeared out of the fog 3 or 4 points on the port bow about 400 yards away at a speed estimated from her bow wave of 4 to 10 knots. The Captain of the Wellesley Victory immediately ordered the helm hard right and signalled the engine

room for full speed astern. The backing signal was sounded. The helm was then ordered hard left but this was countermanded before it could be carried out and the helm again ordered hard right. After the Wellesley Victory had been backing about 1 minute the Esso Springfield ran into the port bow of the Wellesley Victory at approximately a 90° angle and cut 15 feet into the hull at the forecastle deck. The ships were in contact a short time and then the Esso Springfield backed clear. Radio signals were exchanged and each ship reported no need of assistance.

The factual disputes arising out of the respective versions of the collision will be resolved as the contentions of the parties are dealt with.

The libellant and cross-respondent Standard Oil contends, firstly, that the collision was caused by the Wellesley Victory's failure to observe Article 16 of the International Rules for Navigation at Sea, 33 U.S.C.A. § 92, now Section 145n, which read at the time of collision and of trial:

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

■ It is undisputed that the Wellesley Victory first heard the fog signals of the Esso Springfield at least 9 to 10 minutes prior to the collision. The Master, the First Officer and the Third Officer, all admitted hearing the signals at 1:55 p. m. It is further undisputed that no order was given as a consequence of such signals until 2:03 p. m. when the Wellesley Victory engines were reduced to slow ahead. As a matter of fact this order does not purport to be a compliance with Article 16 and is not urged as such. Rather, the Wellesley Victory seeks to avoid the operation of the Article by the claim that her conduct was influenced by a false and misleading twoblast signal given by the Esso Springfield. This claim is based upon the testimony of the Captain, the First Officer and the Third Officer of the Wellesley Victory. In my opinion no such signal emanated from the Esso Springfield despite the belief and testimony of the Wellesley Victory officers that they heard it. The helmsman said he heard a "blast" when pressed on cross-examination. As to hearing a two-blast signal, he said, "I don't know;" "I can't say;" "I don't remember if I did;" although he recalled the Captain's asking, "wasn't that two blasts?" and one of the mates answer, "Yes." The bow look-out did not say that he heard it even though he had all the opportunity in the world to say he did from the form of counsel's questions. No one on the Esso Springfield testified to such a signal from that ship and, as a matter of fact, counsel for the Wellesley Victory did not ask any witness from the Esso Springfield, except the bow look-out, who did not hear it, whether such a signal was given. Not even the Captain was pressed on this when an inconsistency between his trial and Coast Guard testimony regarding signals was called to his attention. It seems highly probable that the Wellesley Victory officers were mistaken in this respect.

■ Assuming, however, that they did hear it, I am at a loss to discover how it excuses the Wellesley Victory. No one claims to have heard it prior to 2:02 or 2:03 p. m. and by that time they had been listening to the fog whistle of the Esso Springfield some 7 to 8 minutes. In the same span of time, they had been violating Article 16 which is quite clear as to the procedure the Wellesley Victory should have taken under these conditions. She should have *stopped her engines*. The Wellesley Victory has no valid excuse for this violation and she must suffer the consequences. Lie v.

San Francisco & Portland S. S. Co., 1917, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726.

The second contention of the libellant and cross-respondent Standard Oil Co. is that the Wellesley Victory was proceeding at an excessive rate of speed under the circumstances. This argument will be considered along with a like argument by the Wellesley Victory.

According to the testimony of the Captain of the Esso Springfield, she had been alternating between half and slow speed from 1:17 p. m. when she dropped her pilot. This is confirmed by the engine room and bridge bell books. Prior to 2:01 p. m., when the order to stop engines was given, the Esso Springfield had been running slow ahead from 1:57 p. m. The Captain estimated the speed at 4 to 5 knots for slow ahead which involves 35 to 40 R. P. M. Prior to 1:57 p. m. she had been running half ahead from 1:51 p. m. which results, the Captain said, in about 10 knots, 60 R. P. M. The second Assistant Engineer of the Esso Springfield testified that half ahead was about 40 R. P. M. and slow, 15 to 18 R. P. M.

According to the Wellesley Victory observers, the Esso Springfield showed a bow wave when they saw her. The First Officer estimated she was making 7 or 8 knots; the Captain figured between 5 and 8 knots; the Second Officer said she was doing 3 to 4 knots at collision; the Third Officer said she was doing 10 knots when he first saw her.

■ It is highly difficult to make any accurate judgment of the speed of the Esso Springfield when she was first observed by the Wellesley Victory. Since she had been alternating between half and slow from 1:17, it might be said she was doing an average of those speeds, 7½ knots. This is suggested by the Wellesley Victory and somewhat accords with her officers' estimates. I have no way of knowing whether the Esso Springfield had reached its slow speed of 4 to 5 knots over the water at 2:01 p. m. which is 4 minutes after the slow ahead order. Apparently, the Captain of the Esso Springfield thinks it did. Whether or not this is so is impossible to say and I can only conclude that the Esso Springfield was making between 4 and 7½ knots at 2:01 p. m. and somewhat less than that range at 2:02 p. m. when she saw the Wellesley Victory.

On the other hand, there is little doubt of the speed of the Wellesley Victory. Admittedly, she was making 9 or 10 knots on half speed prior to the slow ahead bell at 2:03. According to her Third Assistant Engineer, it took about 10 seconds for her engines to reduce to slow ahead. It, therefore, seems unlikely that her speed over the water changed much by 2:04 when the Esso Springfield loomed out of the fog and the Wellesley Victory went full astern.

In the Chattahoochee, 1899, 173 U.S. 540, at page 548, 19 S.Ct. 491, at page 494, 43 L.Ed. 801, the Court said:

"It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

■ In other words, a vessel's speed must be such that she will be able to stop in her share of the visibility. See also The Umbria, 1897, 166 U.S. 404, 17 S. Ct. 610, 41 L.Ed. 1053.

There is wide disagreement between the parties on visibility prior to the collision. No witness for the Esso Springfield estimated it over 500 feet; the Captain said 200 to 300 feet; the bowman figured it about 300 feet while the Second Officer said about 500 feet.

On the other hand, personnel of the Wellesley Victory fixed visibility at no less than 900 feet and no more than 1500 feet.

There is some discrepancy over the time of the collision. The Esso Springfield's engine room bell book fixes it at 2:05 but the Second Assistant Engineer

recorded it as 2:03 in the engineer's log. It seems likely that 2:03, Esso Springfield's time, is closer to the fact than 2:05 because the collision occurred, according to the Esso Springfield personnel, shortly after the full astern at 2:02. The Wellesley Victory has the collision at 2:05. Possibly there was a difference in the clocks in the Esso Springfield engine room and the Wellesley Victry. It really makes no difference, as I see it.

By her own admission the Esso Springfield had no more than 200 to 500 feet visibility. Yet she undoubtedly was making somewhat less than the 4 to 7½ knot range mentioned before. She was, therefore, faced with the problem of stopping within 100 to 250 feet, her share of the visibility. Since she is 504 feet long it may be seen that her maximum share of visibility is less than half her length.

The Wellesley Victory estimated visibility at from 900 to 1500 feet. I think this range is possibly an overestimate of the facts. Whether it is or not the Wellesley Victory was required to stop in her share of it or 450 to 750 feet. She was under headway, as I conclude, of close to 9 or 10 knots when she observed the Esso Springfield, a minute before the collision.

The difficulty with all of the foregoing is that there is nothing in the record to show the ability of the vessels to stop within a given time under these or any other conditions. Counsel for the Esso Springfield suggests a "rule of thumb" which is unsupported by any witness or document. However, even by this "rule" the Esso Springfield was making sufficient headway to advance 450 ft. from 2:02 to 2:03. This rate of advance over a minute is almost 4½ knots.

I have no doubt from all the circumstances that each vessel was making considerable headway at collision. I am further convinced that, though their courses were converging, neither had the ability to stop in its share of the visibility and that, therefore, each was in violation of Article 16. The Chattahoochee, supra; The Nacoochee v. Moseley, 1890, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; The No. 4 (The C. W. Morse), 2 Cir., 1908, 161 F. 847; Griffin on Collision, sec. 117, p. 292.

The manner of contact between the two vessels and the severity of the blow and damage to the Wellesley Victory negative the claim of the Esso Springfield that at the time of the collision she had little or no way on her.

The contentions of the Wellesley Victory are threefold; that the Esso Springfield sounded a false and misleading signal; that her speed was excessive in fog; and that her fault in having a poor look-out and in failing to hear the Wellesley Victory caused the collision. I have considered and disposed of the first two contentions heretofore. I shall now consider the third.

It has been said before that the Wellesley Victory heard the signals of the Esso Springfield at 1:55 p. m., some 9 or 10 minutes prior to the collision. It is undisputed that the Wellesley Victory had been sounding regulation fog signals since 10:57 a. m. Why, therefore, did the Esso Springfield fail to hear the whistle of the Wellesley Victory until, as the Esso Springfield personnel testify, no more than 2 minutes prior to the collision? This question is especially perplexing in view of the undisputed fact that a southerly wind was blowing which wind would carry signals from the Wellesley Victory to the Esso Springfield. The only explanation offered by the Esso Springfield is that sound is unpredictable. The Wellesley Victory suggests three reasons, however, of which only one is appealing.

The Second Officer of the Esso Springfield testified on direct examination as follows:

"Q. How often were you sounding that whistle signal? A. One blast. I would sound a blast and it lasted a minute; then approximately two minutes quiet and then I would sound another blast; so, from

the beginning of one to the next one,—all right,—a blast every two minutes."

and on cross-examination as follows:

"Q. And as I understand your testimony, you were blowing a blast that lasted a minute; then you would wait for two minutes? A. Yes.

"Q. Two minutes of silence, and then you would blow another one-minute blast? A. Yes.

Article 15(a) of International Rules provided at the time of collision and trial as follows:

"A steam vessel having way upon her shall sound, at intervals of not more than two minutes, a prolonged blast." 33 U.S.C.A. § 91(a) now 33 U.S.C.A. § 145m(c) (i).

A "prolonged blast" means "a blast of from four to six seconds duration." Article 15, supra.

█ It is obvious from the foregoing that the Esso Springfield violated Article 15. It may well be that such one minute blast blanketed any proper 4-6 second blasts in the vicinity. It may further be true that such one minute blast dulled the hearing of those on board the Esso Springfield for reception of signals in the two minute interim. Whichever the answer, it is a fact that Esso Springfield personnel heard no whistles from any vessel except a destroyer around 1:17, prior to that of the Wellesley Victory, 2 minutes before the collision. Yet those on board the Wellesley Victory reported several whistles port and starboard.

Aside from the violation of Article 15(a) it is not clear that the Esso Springfield look-outs were inattentive or out of position nor is it clear that the Esso Springfield helmsman and look-out, who did not testify, would have contributed anything detrimental to the Esso Springfield.

Under all the circumstances, I conclude (1) that the Wellesley Victory was at fault for failure to stop upon hearing the whistle of the Esso Springfield and for excessive speed in fog, both violations of Article 16; and (2) that the Esso Springfield is liable for excessive speed in fog and for improper fog signals in violation of Article 15(a). All the foregoing violations contributed to the collision.

Settle decree.