UNITED STATES of America, Libelant,

v.

M/V WUERTTEMBERG, Respondent.

Alexander H. HOOD, Libelant,

v.

M/V WUERTTEMBERG, her engines, boilers, tackle, apparel and appurtenances, Respondent.

Nos. 1091, 1098.

United States District Court
E. D. South Carolina,
Charleston Division.

June 10, 1963.

212

Terrell L. Glenn, U. S. Atty., Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., Thomas F. McGovern, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for libelant United States.

Ben Scott Whaley and Nathaniel L. Barnwell, Charleston, S. C., for libelant Alexander H. Hood.

Harold A. Mouzon and B. Allston Moore, Jr., Charleston, S. C., for respondent, M/V Wuerttemberg, etc.

WYCHE, District Judge (sitting by designation).

An action was commenced in admiralty by the United States of America against the German motor vessel Wuerttemberg for damages done to the Swerve, a Navy minesweeper, in a collision between the German motor vessel Wuerttemberg and the United States minesweeper the Swerve, on the early morning of June 25, 1958, in the entrance to the harbor of Charleston, South Carolina. A cross-libel was filed by the German owners of the Wuerttemberg against the United States for damages suffered by the Wuerttemberg in the collision. Captain Alexander H. Hood filed an action against the German vessel Wuerttemberg for personal injuries which he suffered in the collision on board the Swerve.

The actions were, by agreement of the parties, consolidated for trial, upon the pleadings and the evidence taken in open court and partly by deposition.

Each party contended that the collision was entirely due to the negligence and faulty navigation on the part of the other.

At the conclusion of the testimony taken in open court, I requested counsel for the parties to submit to me proposed findings of fact and conclusions of law in accordance with Admiralty Rule 43. Rules in Admiralty in the United States District Courts for the Eastern and Western Districts of South Carolina, together with written briefs.

After careful consideration of the written briefs, depositions, exhibits and the evidence in the cases, and in compliance with Rule 46½, Rules of Practice in Admiralty and Maritime Cases, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cases, as follows:

FINDINGS OF FACT

1. The two vessels involved in the collision herein are the U.S.S. SWERVE, a wooden minesweeper, 172 feet long, 35 feet beam, 754 tons displacement fully loaded and 658 tons displacement lightly loaded, her draft was about 10.6 feet, she had four engines, two screws, each with special variable pitch propellers; on actual test from full speed ahead to dead in the water the Swerve takes 20 seconds to stop and travels a ship length and a half or 247 feet in so doing; and the German merchant vessel M/V WUERTTEMBERG, a steel motor vessel, 492 feet 10 inches long, 61 feet 4 inches beam, 25 feet 6 inches depth, 6127 gross tons, 9270 dead weight tons, she had one propeller driven by two diesel engines. A diesel vessel like the Wuerttemberg must bring her diesel engine to a complete stop then reverse a valve mechanism, then apply the air starting mechanism to get the engine started in the reverse direction. This takes 30 to 40 seconds and then after the engine is started backwards, the throttle has to be opened to get power astern. With power going astern, it would then take from one minute and a half to three minutes to stop the vessel, depending on the load. During this time she would continue to advance, even on a right rudder, along her original course, for about 250 yards.

The Swerve has a maximum top speed of 15.8 knots; full speed of 14 knots; standard speed of 12 knots; one-third speed of 4 knots.

The Wuerttemberg was designed to make 16.29 knots but did not test out to her designed speed; she would make 14 knots at 100 r.p.m. or full speed, and 8.2 knots at 60 r.p.m. half speed.

2. Both the Swerve and the Wuerttemberg were equipped with radar. The Wuerttemberg had an American-built Pathfinder RCA radar, a well-known and dependable set, installed on a great many merchant ships. It has range rings, one mile, two miles, four miles, eight miles, twenty miles and forty miles. If in good order, it could have picked up Fort Sumter at eight miles and a ship like the Swerve at eight miles.

The Swerve was equipped with an SPS5B radar with a graduated scale

which can be expanded, and a manual crank to get the range or bearing. If in good order, it could have picked up a ship the size of the Wuerttemberg at 15,000 yards or 12½ miles.

The Swerve was also equipped with and was using a special device called an Underwater Object Locator or UOL, which is not like sonar; is not used for listening to other ship screws; and is not capable of listening but has a high frequency beam for mine detection. This beam is capable of detecting the anchor chain and anchor of a buoy, and the profile of the channel. It locates exact range within five feet and bearing within one degree. Its most effective range is about 700 yards, depending on the temperature and condition of the water with a maximum range of 1000 yards under perfect conditions. It works better in rough than in calm water since calm water contains pre-existing noise in the water itself. On this day the water was calm and the effective range was 500 yards.

3. June 25, 1958, the day of the collision began clear, it was dead calm. A bank of dense fog was encountered lying like a belt across the channel from the Fort Sumter or west side to the Sullivans Island or east side.

There was other traffic in the area which was operating partially in clear and partially in fog. These were the Navy tug Penobscot, which was inbound ahead of the Wuerttemberg, which was also inbound; and the submarine Redfin operating on the surface, which was outbound.

The Redfin, outbound, while going down Rebellion Reach encountered dense fog, visibility around 150 feet at a point between Buoy No. 1 and Buoy No. 2. The Redfin reduced speed, commenced blowing fog signals, and took steps visually to locate Buoy 25, the next buoy down. The Pilot visually sighted this buoy about 100–150 feet off, the limit of visibility, and changed course for the next leg, the Mount Pleasant Reach. He came out of the fog about halfway between Buoy 25 and Buoy 23. When abeam, i. e., abreast of, Buoy 23 he passed the inbound Penobscot. At that time he could visually see the Penobscot and behind her, down at the jetties, he could visually see the Wuerttemberg. He passed the Wuerttemberg just before he turned into the Fort Sumter Range at Buoy 20. He did not see the Swerve at any time.

The Navy tug Penobscot, 143 feet long, 30 feet beam, 16 feet draft, with operating radar on, was inbound. The Penobscot came close to only one other vessel, the outbound Redfin. The Commanding Officer of the Penobscot remembered a slight morning haze but had good visibility until he was up on the Mount Pleasant Range, (also called the Mount Pleasant Reach). He reduced speed. His engine room logged this at 0613. His time is checked at noon daily with the radio time signal. He commenced sounding fog signals. His bridge book logged this at 0615. He received a report from his radar of a ship outbound and sighted her visually about 45 degrees on the port bow, about 100 to 200 feet away. The outbound Redfin was the only ship he was concerned with and to his recollection, the only one he saw. At this time he was sounding fog signals, but did not recall if he heard any from the Redfin. Because of the fog he had no way of knowing his exact position. The Penobscot was in the fog from that time until she anchored at 0629 and blew fog signals until she dropped anchor. She had no trouble with tide or current.

4. All of the events involved took place between Buoy 20, which marks the intersection of the Fort Sumter Range or Reach with the Mount Pleasant Range or Reach, and Buoy 25 which is off Fort Sumter and marks the place where the Mount Pleasant Range or Reach ends in a Y with the right fork becoming Rebellion Reach and the left fork becoming South Channel.

In this area there is a Buoy No. 21 on the west side opposite Buoy No. 20 at the place where the Fort Sumter Range meets the Mount Pleasant Range. There is next, upbound toward the harbor, on

the west side, Buoy No. 23, which has no companion on the other side of the channel. In back of and to the west of Buoy No. 23 is the front light of the Fort Sumter Range.

5. The Swerve departed the old Mine piers on the Ashley river in clear weather and her navigating officer could see the TV tower by the Cooper River Bridge and the after range on Fort Sumter. As she proceeded down South Channel, the bearing takers reported that they were not able to see the navigation marks, and the captain could no longer see Sullivans Island. This was logged at 0611. She reduced speed to 9 knots, then to 4 knots at 0611. She was then between Buoy 27 and Buoy 25 in South Channel.

The radar navigation team was directed to go into operation. The bow telephone talker whose regular station was at the bow capstan moved forward next to the bow lookout on the very bow. A top lookout was stationed on the highest part of the ship, the search light platform 30–40 feet above the water. Both the bow and the top lookouts had binoculars.

The radarman asked the deck to get him a visual bearing to Buoy 27 which he could check with his radar and UOL. This position was obtained. He then noted the traffic ahead (the Redfin-Penobscot passing). He began continually to feed the information to the captain. After the inbound and outbound contacts (the Redfin-Penobscot) had passed each other the other side of Buoy 27, he watched them until that situation cleared up then reported to the bridge that his course was good to the end of the channel. The bridge asked for a course to steer to Buoy 25 which they were coming up on and he gave courses to pass it close to starboard, i. e., on their right-hand. The ship was at all stop and the buoy was "almost coming down our throat" on the radar and "walking in on the U.O.L. scope" when the radarman reported to the Quartermaster that the buoy should be sighted right off the starboard bow close aboard, and it was so sighted. The Quarter-

master sighted it visually and made it his 0618 position. The ship had been dead stopped with her variable pitched propellers off the buoy at between stop one-third ahead and one-third back to let the Redfin-Penobscot traffic by. It was dead calm with dense fog. The Quartermaster estimated they came as close as 10 yards to Buoy 25. The bow lookout read the number with his bare eye, and estimated it was 50 feet or so.

The UOL or Underwater Object Locator was used to locate both the Buoy 25 and the cut-out profile of the dredged channel.

6. As the Swerve rounded Buoy No. 25, she was on course 125 degrees for about 30 seconds, then changed to 137 degrees, then to 148 degrees as a result of advice from radar. When she was on 125, the radarman expanded the range scale with the hand crank to check the entrance to the jetties to follow the Redfin contact and saw on the scope an inbound contact which he reported as a contact closing fast at 1400 yards. The radarman estimated the closing rate at 400 yards a minute. The Quartermaster on deck estimates the report, the first notice of the Wuerttemberg was made between 0618 and 0619. (S.T.)

The Quartermaster while on 137 degrees asked radar for a course which would take them as close to Buoy 23 as possible and still leave a margin of safety. The recommended course was 148 degrees. He also asked how far they could come to the right before they hit the buoy and that course was given as 152. The Swerve came around to 148 degrees. The radarman reported the contact at 700 yards.

The radarman could not figure out why the contact (the Wuerttemberg) was going at such a high speed in fog and in a meeting situation in a small channel, the radar is not precise, so he shifted the flow of information to the man on the UOL who had picked up a big ship coming in at about 345 degrees relative, which is a little off the port bow, at a speed of from 12 to 14 knots.

7. A Lt. Commander had the conn, i. e. the direction of the ship, when the first report was made, and changed the course of the ship to 148 degrees, but after the second report was made the Commanding Officer of the Swerve took over the conn. By this time the Wuerttemberg was visible coming in at 345 degrees relative or 350 degrees relative or about 10 degrees on the port (left) side, her bow coming straight toward the Swerve.

8. The Quartermaster, who had served on such type vessels as the Wuerttemberg, estimated the distance of the Wuerttemberg when she was visually sighted, as about 225 yards and her speed from the bow wake or bone in her teeth as between 12 and 14 knots; the Commanding Officer, who had been standing by the conning officer before he took over the conn of the ship after the second report, estimated the distance of the Wuerttemberg as 100–150 yards away. She was reported by both the bow lookout and the top lookout. The bow lookout and his telephone talker heard her noise before they saw her. The bow lookout estimated visibility ahead at about 20 feet. His talker estimated she was 50 yards. The top lookout on the searchlight platform saw her mast first, her deck was obscured by fog, then he saw her bow almost dead ahead slightly to port. He reported to the bridge.

9. From 0612 or 6:12 a. m. (S.T.) when she was above Buoy 25 in South Channel until just before the collision the Swerve's whistle was sounding fog signals. It was blown by the Signalman who timed his whistle with a stop watch. It was a standard type loud fog horn. Each time it blew, it rocked the top lookout.

10. When the Wuerttemberg first broke out of the fog, about 100–150 yards off, the Commanding Officer of the Swerve considered that the other vessel was on a steady course. He ordered all back full emergency and left full rudder when backing to swing the Swerve's bow to the right. Three blasts were ordered and blown on the Swerve's whistle to indicate "my engines are going at full speed astern" under the Pilot Rules. The Commanding Officer of the Swerve heard one short blast from the other vessel, indicating she was turning right. The other vessel began to swing right and while the Swerve had been making sternway, her Commanding Officer then ordered all astern full and right full rudder to soften the blow and five blasts of the whistle were sounded. As the larger ship and smaller ship swung, the flare of the port bow of the Wuerttemberg brushed against the port side of the Swerve amidships, knocked in the boats and davits, knocked over Captain Alexander Hood injuring him and doing substantial damage to the Swerve but very little damage to the Wuerttemberg. Those on the stern of the Swerve could see a black buoy astern on which their ship appeared to be backing down.

11. The Wuerttemberg arrived off the entrance of Charleston harbor on the early morning of June 25, 1958, and picked up a State Pilot around 0532 (W.T.) near Buoy 2C. The weather at this time was good. There was little or no wind. There was a slight haze, which is usual in early summer mornings in and about Charleston harbor. The Captain of the Wuerttemberg admitted that when the Pilot came aboard, the Pilot told him that they were going to have to expect something like a 3 knot current, and according to the Captain the Wuerttemberg had its radar in operation when she approached the coast, set on a four-mile range, and the Captain showed the Pilot how the radar was working, but did not continue to use the radar, the Captain put it on stand-by.

Before the Wuerttemberg reached Buoy 20 and at Buoy 20 it was not possible to see the Church spires of Charleston, which are navigation marks in the United States Coast Pilots' books for courses into Carleston harbor.

At no time did the officers or crew of the Wuerttemberg see the Penobscot or any other vessel proceeding them up the channel.

The channel course is 317½ degrees. The Pilot had the Wuerttemberg on 318 degrees until Buoy No. 20 when he altered 3 degrees to his left on 315 degrees to allow for tidal current. It got hazy, the Pilot could not pick up Buoy No. 23. He went to half speed and sounded a fog whistle. He never saw either the front range or the rear range of the Fort Sumter Range "the whole way up the channel". At Buoy No. 20 he could not see the Mount Pleasant Range, which is customarily used between Buoy No. 20 and Buoy No. 25. At Buoy No. 20 he could not see the tower on Fort Sumter. He was not steering on any range or landmark.

The Wuerttemberg met and passed United States submarine Redfin outward-bound at Buoy No. 20.

At 6:20 (W.T.) when the Wuerttemberg went from full ahead to half speed, before they heard fog signals, the visibility was "hazy" according to the Captain, and the Wuerttemberg sounded fog signals off Buoy No. 23 in the Mount Pleasant Range.

After the change of speed and the blowing of fog signals, according to the Captain, he switched on the radar, which had been on stand-by, and glanced at it, and saw no recognizable image.

At the Coast Guard investigation and in his report to the State Pilot Commission the Pilot of the Wuerttemberg said nothing about looking into the radar but at the trial he testified that he looked at it after he sounded his fog whistle and put his engines at half ahead and before he heard the Swerve's fog whistle, and there was a picture on the scope, the sweep was going around like a pinwheel and no pips appeared ahead, he could not see any identifying things on the screen (i. e., P.P.I. scope), not any marks he could identify, not even Fort Sumter.

After the lookout reported a whistle ahead (the Swerve's fog whistle) the Pilot of the Wuerttemberg did not stop his engines. He had been on full ahead from 0533 until 0620 (W.T.), reduced to half ahead, or 8.2 knots, at 0620 (W.T.) and just before the collision, cut his engines to slow ahead and dead slow ahead. The engine room log of the ship gives 0622 (W.T.) for three signals, forward slow, forward very slow, forward slow. The smooth deck log shows the collision at 0623 (W.T.). The engine logs shows full ahead at 0623 (W.T.).

According to the recollection of the captain of the Wuerttemberg he asked the Pilot why he didn't stop the engines and was told, "No, let him turn". The record is clear that the Pilot had no intention of stopping his engines and told the Coast Guard, "I couldn't back on the ship or nothing else. You just can't back a ship like that. They don't back that quick." At the trial he testified, "No, sir, you couldn't stop the ship." The Pilot on the Wuerttemberg went hard right and blew one short blast for a port to port passing. He did not then regard it as an in extremis situation and thought he had plenty of room to get to the right of the Swerve. The Swerve was not doing anything, she was just stopped, sitting there.

At this time the Pilot of the Wuerttemberg heard the Swerve blow three blasts for full speed astern (under the Pilot Rules this is, "My engines are going at full speed astern".) When he heard the three blasts, it was impossible to miss. She was only five to ten feet away. The port after quarter of the Swerve hit under the flare of the port bow of the Wuerttemberg. The ships parted and the Wuerttemberg went ahead on a left rudder, away from Sullivans Island, came to 280 degrees, ran on that for a minute, went full astern, and dropped anchor. No bearings could be taken until the fog cleared which was about one and a half or two hours later. At this time those on the Wuerttemberg visually sighted the Swerve for the first time, her distance off, which is the range of visibility, was, about 1000 feet, according to the Captain; 200 to 300 meters, according to the Mate; 150 to 300 meters, according to the Officer Candidate; 100 to 150 meters, according

to the Carpenter; 900 to 1000 feet, according to the Pilot (a meter is 3.28084 feet or roughly a yard, precisely a meter is 1.09361 yards).

12. According to the Pilot there was a certain amount of noise from the stack of the Wuerttemberg out of the motor exhaust, but no propeller noise because the ship's propeller was under water. The bridge lookout on the Wuerttemberg was absent from his post while dipping the flag above Buoy No. 20, and his post was near the noisy exhaust stack.

An alert lookout on the bow of the Wuerttemberg, free from other duties and clear of the stack noise of the ship's diesel engines, should have sighted or heard a whistle from the Penobscot, which was in the Mount Pleasant Range ahead, and which from the time the Penobscot passed the Redfin at Buoy No. 23 until the Penobscot anchored above Buoy No. 25, was in the area between Buoy No. 23 and Buoy No. 25, sounding fog signals from 0615 to 0629 (Penobscot time).

13. The distances measured on straight lines, the lines of vision, using the scale on Chart 470, are: From Buoy No. 20 to Buoy No. 25, distance 1.51 miles; From Buoy No. 20 to Buoy No. 23, distance 1850 yards; From Buoy No. 20 to Fort Sumter Front Range, distance 2175 yards; From Buoy No. 20 to the tower on Fort Sumter, distance 1.72 miles; From Buoy No. 23 to C17, in the jetties, distance 1.67 miles.

14. Because of the fog, neither vessel had any accurate bearings until they had passed each other, altered course and anchored. The dead reckoning position of the Swerve based on the UOL range and bearing of the buoy and of the profile of the cut channel is outside the channel on Swerve's own righthand side and inside the fog belt.

15. The Government sent a survey ship, the Marmer, equipped with a Roberts current meter, into the Charleston harbor, which ran tests for twenty-nine days during 1962. This ship found a tidal current off Fort Sumter of a maximum of 2.5 knots at a slightly different time than the tables. With the time shift, the new data for the time of the collision came out at the same 2.4 knots as did the old tables.

■■ The harbor pilots had not used any instruments except "seaman's eye" in measuring the current, and the difference between planned course and course made good. This is current, not tidal current, and includes all the forces including wind, causing a discrepancy between a dead reckoning position and a fix. Tidal current is the force of the movement of the water without regard to other factors such as wind and the state of the sea.

According to the Government tidal expert it was entirely possible to have an ebb of 5 knots which was twice that of the flood, but such an event would entail a transport of water which would have to be accounted for, by being piled up someplace or held up by wind. Such a matter would show on the Charleston tide record, kept automatically by the tide gauge machine at Union Terminal, Charleston. This record has been kept in this area since 1921, and is an accurate record kept by a machine and checked by a man in the regular course of business. This tidal record confirms the calculation and shows a value of 2.6 knots ebb on June 25, 1958.

There was no wind on the day of the collision, it was a dead calm. There was no discharge of any amount from the Cooper-Santee dams. There was no rain until June 27, 1958.

At no time did the helmsman on the Wuerttemberg have any difficulty in steering because of current; no current was setting his rudder over in one direction or another; no allowance had to be made for current.

At no time did the helmsman of the Swerve find any difficulty in steering or any unusual current or tidal effects.

■ 16. The current, no matter what it was or how defined, is of no importance on the question of the speed of the two meeting vessels and on whether in view

of the visibility that speed was moderate. Two vessels approaching each other in a moving medium are being moved by the same medium and the relative approach depends entirely upon their speed through the water, not on their speed over the ground.

17. The logs of the Swerve were all produced at the trial. The rough deck log of the Wuerttemberg which was the original book of entry, from which the smooth log was made up after the accident, was not produced. It was demanded at the depositions taken in February, 1959, a few months after the accident. It had been aboard the vessel but was thrown overboard.

18. The collision occurred at 0623 Wuerttemberg time, at 0622 Swerve time, on June 25, 1958.

### CONCLUSIONS OF LAW

1. The destruction of the rough deck log book of the Wuerttemberg and its failure to prove its stopping time, headreach and advance gives rise to the admiralty presumption that production and proof would have been unfavorable to the Wuerttemberg's case. The Arabic, 34 F.2d 559, 561 (S.D.N.Y.1929); United States v. Delaware Bay & River Pilots' Ass'n, 44 F.2d 1, 4 (CA 3, 1930); The Sicilian Prince, 128 F. 133 (S.D.N.Y. 1904); The Ernest H. Meyer, 84 F.2d 496 (CA 9, 1936); Kirby v. Tallmadge, 160 U.S. 379, 383, 16 S.Ct. 349, 40 L.Ed. 463 (1896); Midland Steamship Line v. The Arkansas, 232 F.2d 81 (CA 6, 1956).

2. Those in charge of the navigation of the Wuerttemberg knew, or if they had been keeping a good lookout should have known, that there was a fog bank ahead and their speed on entering or on nearing that fog bank was excessive. The Charlotte, 124 F. 989 (E.D.Va. 1903) affirmed, 128 F. 38 (CA 4, 1904); The Michigan, 63 F. 280 (CA 4, 1894); The Perkiomen, 27 F. 573 (D.Mass. 1886); The City of Alexandria, 31 F. 427 (S.D.N.Y.1887); The Trave, 55 F. 117 (S.D.N.Y.1893); The Silver Palm, 94 F.2d 754 (CA 9, 1937); The Munalbro, 280 F. 224 (D.Mass.1922).

3. Those in charge of the navigation of the Wuerttemberg should have sounded the fog bank with their radar for other vessels and should have reduced speed and stopped if necessary until this had been done. The Medford, 65 F.Supp. 622 (E.D.N.Y.1946); Afran Transport Co. v. The Bergechief, 274 F.2d 469 (CA 2, 1960); Wood v. United States, 125 F.Supp. 42 (S.D.N.Y.1954).

4. After the Wuerttemberg began sounding fog signals, she should have reduced her speed through the water to bare steerage way. The Nacoochee, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687 (1890); The Ansaldo Savoia, 276 F. 719 (E.D.Va.1921); The Michigan, 63 F. 280 (CA 4, 1894); The Sagamore, 247 F. 743 (CA 1 1917).

5. After those aboard the Wuerttemberg heard the fog whistle of the Swerve, it was their statutory duty immediately to stop their engines. Failure to do so constituted a statutory fault under the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, and cast upon the Wuerttemberg the burden of proving that this fault could not have contributed to the collision. This burden has not been sustained. Lie v. San Francisco & Portland S.S. Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726 (1917); Johnston-Warren Lines v. United States, 196 F.2d 689 (CA 2, 1952); The Amagansett, 220 F. 827 (CA 2, 1915).

6. After those aboard the Wuerttemberg heard the fog whistle of the Swerve, it was their duty under the navigation in fog decisions to stop and to reverse their engines so as to always keep their vessel able to stop within their own vessel's share of the visibility. Southern Pac. Co. v. United States, 72 F.2d 212 (CA 2, 1934); The Julia Luckenbach, 219 F. 600, 604 (E.D.Va., 1914); The Sylvan Arrow, 104 F.2d 102 (CA 2, 1939); Anglo-Saxon Petroleum Co. v. United States, 222 F.2d 75 and 224 F.2d 86 (CA 2, 1955); Standard Oil Company v. The Wellesley Victory, 127 F. Supp. 273 (S.D.N.Y., 1954).

7. Those aboard the Swerve complied with the fog speed and narrow

channel rules and were not at fault for the collision, which would have been avoided if the other vessel had been going equally slowly and had gone full speed astern when the Swerve went full speed astern.

8. Failure of the navigator to make intelligent and reasonable use of dependable radar equipment which is furnished him to inform himself of presence of an approaching vessel may be foundation for a finding of negligence leading to liability. White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419 (CA 4, 1960) noted 82 A.L.R.2d 757.

9. I conclude that the Wuerttemberg should have known of fog, or mist, sooner than 6:20 (W.T.) when she was just above Buoy No. 20; a bow lookout should have seen, or if the tug was already in mist, heard the fog whistle of the Penobscot; a radar check should have showed a pip for Penobscot, a pip for Redfin, as well as pips for the channel buoys when the German captain demonstrated it to the pilot; the pip from the Swerve might have been obscured by the larger pip for Fort Sumter, or merged with the pips for Buoy No. 25, but a radar which showed buoys within four miles should have shown ships within four miles; the Wuerttemberg's speed was excessive and her radar defective when she plunged into the fog bank; reliance upon defective radar explains Wuerttemberg's failure to anticipate the traffic and her speed into the morning haze which became mist and then fog and which obscured Fort Sumter and the usual navigating marks and ranges.

Therefore, the collision between the Wuerttemberg and the Swerve, and the consequent damages and injuries, were due solely to the fault, negligence and want of care on the part of the Wuerttemberg, her officers, crew and pilot, in the handling of the Wuerttemberg, and such faulty navigation was the sole and proximate cause of the collision; the Swerve, and those in charge of her, were not at fault or guilty of any negligence in the handling of the Swerve which caused or contributed to the collision.

10. The collision and the damages including the injury to Alexander H. Hood are the sole fault of the Wuerttemberg and an interlocutory decree in customary admiralty form will be entered, on notice, adjudicating such sole fault and providing for the customary reference of the proof of damages to a commissioner named in said decree.